Celeste K. Miller (ISB # 2590)
McDevitt & Miller, LLP
420 West Bannock
P.O. Box 2564-83701
Boise, Idaho 83702
Ph: (208) 343-7500
Fax: (208) 336-6912
ck@mcdevitt-miller.com

Laura King, *pro hac vice* (MT Bar # 13574)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
king@westernlaw.org

John R. Mellgren, *pro hac vice* (OR Bar # 114620)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Plaintiffs WildEarth Guardians, Cascadia
Wildlands, Boulder-White Clouds Council, Kootenai
Environmental Alliance, and Predator Defense*

Andrea Lynn Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs Center for Biological Diversity,
Western Watersheds Project, and Project Coyote*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## EASTERN DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, CASCADIA WILDLANDS, BOULDER-WHITE CLOUDS COUNCIL, KOOTENAI ENVIRONMENTAL | Case No. 1:14-cv-00488-REB |

ALLIANCE, PREDATOR DEFENSE,
CENTER FOR BIOLOGICAL DIVERSITY,
WESTERN WATERSHEDS PROJECT, and
PROJECT COYOTE,

      Plaintiffs,

v.

JOE KRAAYENBRINK, in his official
capacity; UNITED STATES BUREAU OF
LAND MANAGEMENT, a federal agency;
CHARLES A. MARK, in his official capacity;
and UNITED STATES FOREST SERVICE, a
federal agency,

      Defendants.

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This is a civil action for declaratory and injunctive relief, arising under the

Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, and alleging violations of the

National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h, and the federal

regulations governing the issuance of United States Forest Service permits, 36 C.F.R. § 251.50-

65.

2.      Plaintiffs WildEarth Guardians, Cascadia Wildlands, Boulder-White Clouds Council,

Kootenai Environmental Alliance, Predator Defense, Center for Biological Diversity, Western

Watersheds Project, and Project Coyote (collectively, "Plaintiffs") seek a declaration that

Defendant United States Bureau of Land Management's (BLM) "Environmental Assessment for

Predator Hunt Derby Special Recreation Permit" (EA), and associated Finding of No Significant

Impact (FONSI) and Decision Record (DN) violated NEPA, and that BLM's authorization of a

Special Recreation Permit (SRP) for a carnivore killing contest on BLM lands in the Salmon,

Idaho area on the basis of the EA, FONSI, and DN violated federal law and was otherwise

arbitrary and capricious.

3.      Plaintiffs seek a declaration that BLM must issue an SRP and comply with NEPA before

allowing a carnivore killing contest on BLM lands in the Salmon, Idaho area like those proposed

by Idaho for Wildlife (IFW) for BLM lands for late December 2013 and early January 2015 and

anticipated to be proposed again for late 2015 or early 2016 and annually during a similar

timeframe.

4.      Plaintiffs seek a declaration that the United States Forest Service (USFS or Forest

Service) violated federal law and acted arbitrarily and capriciously when it determined, on

August 19, 2014 and January 9, 2015, that a special use permit is not required for carnivore

killing contests on USFS lands in the Salmon, Idaho area like those that occurred in late December 2013 and early January 2015 and which remain proposed for future years.

5.      Plaintiffs seek a declaration that USFS must issue a special use permit and comply with NEPA before allowing a carnivore killing contest on USFS lands in the Salmon, Idaho area like those held by IFW in late December 2013 and early January 2015 and proposed for future years.

6.      Plaintiffs also seek related injunctive relief preventing the BLM and USFS from allowing any future carnivore killing contest on BLM or USFS lands in the Salmon, Idaho area until BLM and USFS have issued appropriate permits for the contest and completed any required environmental review pursuant to NEPA.

7.      Should Plaintiffs prevail, Plaintiffs will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant), 2201 (injunctive relief), and 2202 (declaratory relief).  The current cause of action arises under the laws of the United States, including the APA and NEPA.  An actual, justiciable controversy exists between Plaintiffs and Defendants. The Forest Service has determined that no special use permit is required for a carnivore killing contest that is planned annually and indefinitely for the Salmon area. Later this year, BLM is likely to approve an annual carnivore killing contest on BLM lands in the Salmon area using a similar environmental assessment to the one that BLM issued and at the last minute withdrew this year, citing changes to the permit application.  The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. § 706.

9.      Venue in this Court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. Carnivore killing contests are contemplated to occur annually on BLM and USFS lands in the Salmon, Idaho area. The EA that is challenged through this action was prepared by the BLM's field office in Salmon, Idaho. The Forest Service official who determined that a special use permit was not required for the carnivore killing contest is headquartered in Salmon, Idaho. Salmon, Idaho is located in Lemhi County.

10.     This case is properly filed in the Eastern Division of the U.S. District Court for the District of Idaho pursuant to District Local Rule Civ. 3.1 because the decisions at issue in this action were made in Lemhi County, Idaho.

**PARTIES**

11.     Plaintiff WILDEARTH GUARDIANS is a non-profit organization headquartered in Santa Fe, New Mexico. WildEarth Guardians is dedicated to protecting and restoring the West's wild places, rivers, and wildlife, including gray wolves, coyotes, and other carnivores. WildEarth Guardians has more than 65,000 members and supporters and maintains offices in New Mexico, Colorado, Montana, Arizona, Utah, Oregon, Wyoming, and California. WildEarth Guardians brings this action on its own behalf and on behalf of its adversely affected members. WildEarth Guardians and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. WildEarth Guardians and its members are injured and adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

12.     Plaintiff CASCADIA WILDLANDS is a non-profit organization headquartered in Eugene, Oregon.  Cascadia Wildlands has more than 12,000 members and supporters throughout

the United States, including members who reside in Idaho.  Cascadia Wildlands educates,

agitates, and inspires a movement to protect and restore Cascadia's wild ecosystems.  Cascadia

Wildlands brings this action on its own behalf and on behalf of its adversely affected members.

Cascadia Wildlands and its members are injured and adversely affected by BLM's failure to

comply with federal environmental laws. Cascadia Wildlands and its members are injured and

adversely affected by the Forest Service's failure to require a special use permit for the annual

carnivore killing contest.

13.     Plaintiff BOULDER-WHITE CLOUDS COUNCIL (BWCC) is a non-profit organization

headquartered in Ketchum, Idaho. BWCC was founded in 1989, to protect as Congressionally-

designated Wilderness the 550,000-acre Boulder-White Cloud Mountains in central Idaho. The

Boulder-White Clouds lie mostly within the Salmon-Challis National Forest as well as adjoining

BLM lands managed by the Challis Field Office. BWCC's mission has since expanded to other

nearby areas including the Lost River Range, Pasimeroi, Lemhi and Pioneer Mountains on the

Salmon-Challis National Forest and BLM lands. BWCC also works on issues relating to mining,

grazing, timber, recreation, and imperiled species (with particular emphasis on wolves). With

800 supporters, BWCC works to educate its members, the public at large, and the media, on why

preserving the Boulder-White Clouds and surrounding mountain ranges is important, for current

and future generations of humans and wildlife. The Boulder-White Cloud Mountains are the

largest, unprotected roadless area left on Forest Service lands in the Lower 48 states. The

headwaters of the famous Salmon River is near Galena Summit, and the Salmon River flows

along the western and northern edge of the White Cloud Mountains. BWCC's supporters fish

and raft on the Salmon River, which flows through the towns of Stanley, Challis, and Salmon.

All along the River corridor and the adjoining Salmon-Challis Forest and BLM lands, BWCC

and its supporters hike, mountain bike, ride horses and ATVs, gather mushrooms, cut firewood, explore old mine ruins, rock hound, cross country ski, snowmobile, and especially enjoy observing and photographing wildlife. BWCC brings this action on its own behalf and on behalf of its adversely affected members. BWCC and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. BWCC and its members are injured and adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

14.     Plaintiff KOOTENAI ENVIRONMENTAL ALLIANCE (KEA) is a non-profit organization headquartered in Coeur d'Alene, Idaho. Founded in 1972, KEA is the oldest non-profit conservation organization in Idaho. KEA's mission is to conserve, protect and restore the environment, with a particular emphasis on the Idaho Panhandle and the Coeur d'Alene basin. KEA is a watchdog over federal lands, an advocate for wildlife, and a staunch defender of the natural and scenic resources that make North Idaho so special. With more than 400 members, KEA works to foster an informed and engaged citizenry on issues of conservation and community. KEA brings this action on its own behalf and on behalf of its adversely affected members. KEA and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. KEA and its members are injured and adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

15.     Plaintiff PREDATOR DEFENSE is a non-profit organization headquartered in Eugene, Oregon. Predator Defense has more than 1000 supporters throughout the United States, including supporters who reside in Idaho. Predator Defense works to protect native predators and to create alternatives for people to coexist with wildlife. Predator Defense was established in 1990 with a focus on predator rehabilitation. In 1995, in light of the increasing difficulty of finding suitable

release sites for rehabilitated animals, Predator Defense closed its rehabilitation center and broadened its focus to address the public management policies and predator control methods threatening predators and their habitat. Predator Defense works to spearhead legislation, disseminate research findings, monitor government agencies, and, when necessary, pursue legal action, to protect wildlife species. Predator Defense also serves as a resource for reporters, elected officials, and the public. Predator Defense has been very active on wolf issues through education, lobbying, participation in regulatory processes, and other efforts. Predator Defense recently produced a film, "The Imperiled American Wolf," to raise awareness to the current plight of the species. Predator Defense brings this action on its own behalf and on behalf of its adversely affected members. Predator Defense and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. Predator Defense and its members are injured and adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

16.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit organization that is dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems.  The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country, including Idaho.  The Center has more than 50,000 members, including many who reside in, explore, and enjoy the native species and ecosystems of the Northern Rockies. The Center and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. The Center and its members are injured and adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

17.     Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit conservation organization that was founded in 1993, with the mission of protecting and restoring western watersheds and wildlife in the American West through education, public policy initiatives, and litigation.  Headquartered in Hailey, Idaho, Western Watersheds Project has over 1,500 members and field offices in Idaho as well as Montana, Utah, Wyoming, Arizona, and California.  Western Watersheds Project has maintained a public policy program for many years that is directed at advocating for statutory and regulatory protection of gray wolves in the Northern Rockies. Western Watersheds Project and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. Western Watersheds Project and its members are adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

18.     Plaintiff PROJECT COYOTE is an organization that works to promote coexistence between people and wildlife through education, science, and advocacy.  Project Coyote aims to create a shift in attitudes toward native carnivores by replacing ignorance and fear with understanding and appreciation.  Project Coyote accomplishes its mission by championing progressive management policies that reduce human-coyote conflict, by supporting innovative scientific research, and by fostering respect for and understanding of America's apex predators. Project Coyote has over 9,700 members and constituents, including members and constituents who explore and enjoy the native species and ecosystems of the Northern Rockies. Project Coyote and its members are injured and adversely affected by BLM's failure to comply with federal environmental laws. Project Coyote and its members are adversely affected by the Forest Service's failure to require a special use permit for the annual carnivore killing contest.

19.     The aesthetic, recreational, scientific, educational, and other interests of WildEarth

Guardians, Cascadia Wildlands, BWCC, KEA, Predator Defense, the Center, WWP, and Project

Coyote  and their members have been, are currently, and will in the future be adversely affected

and irreparably injured by the BLM and Forest Service's actions as alleged in this complaint.

Plaintiffs have suffered past injury, currently suffer existing injury, and are likely to suffer future

injury due to the BLM's and Forest Service's violations of mandatory duties under the APA and

NEPA. This injury is caused both by the Federal Defendants' actions as they apply to the annual

carnivore killing contest in Salmon, Idaho, and as those actions apply (on the basis of precedent,

influence, or policy) to other carnivore killing contests throughout the United States. These are

actual, concrete, particularized injuries. The relief sought in this case would redress these

injuries.

20.     Plaintiffs' members, staff, and supporters are dedicated to ensuring the long-term survival

and recovery of carnivore populations, including populations of the gray wolf and coyote, in

Idaho and throughout the western United States.  They have significant interests in observing,

photographing, and otherwise enjoying gray wolves, coyotes, and other carnivores in and around

Salmon, Idaho, and across the western United States. Plaintiffs' members, staff, and supporters

live near Forest Service and BLM land in Idaho that will be open to the annual carnivore killing

contest.  Plaintiffs' members, staff, and supporters regularly recreate on the Salmon-Challis

National Forest and BLM land managed by BLM's Salmon Field Office and enjoy the

opportunity to view wildlife on those lands, including gray wolves and coyotes. Plaintiffs'

members, staff, and supporters live near Forest Service and BLM land in other parts of the

western United States where carnivore killing contests may be allowed or approved on the basis,

precedent, influence, or policy set by the Federal Defendants' allowance and approval of the Salmon-area annual carnivore killing contest.

21.     Defendant JOE KRAAYENBRINK is sued in his official capacity as Manager for the Idaho Falls District of the Bureau of Land Management. Mr. Kraayenbrink signed the Decision Record and Finding of No Significant Impact that are challenged in this complaint. Mr. Kraayenbrink is the federal official responsible for applying and implementing the federal laws and regulations at issue in this complaint.

22.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency of the United States and is a division of the United States Department of the Interior. The BLM is charged with managing public lands and resources in Idaho in accordance and compliance with NEPA, the APA, and other federal laws and regulations. The BLM is the federal agency responsible for applying and implementing the federal laws and regulations at issue in this complaint.

23.     Defendant CHARLES A. MARK is sued in his official capacity as Forest Supervisor for the Salmon-Challis National Forest. Mr. Mark made the determination that a special use permit is not required for a carnivore killing contest on Forest Service lands near Salmon, Idaho. Mr. Mark is the federal official responsible for applying and implementing the federal laws and regulations at issue in this complaint.

24.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States and is a division of the United States Department of Agriculture.  The Forest Service is charged with managing public lands and resources in Idaho in accordance and compliance with NEPA, the APA, and other federal laws and regulations.  The Forest Service is the federal agency

responsible for applying and implementing the federal laws and regulations at issue in this complaint.

## STATUTORY AND REGULATORY BACKGROUND

### The National Environmental Policy Act

25.     Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).

26.     NEPA aims to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

27.     The Council on Environmental Quality (CEQ) promulgated uniform regulations that implement NEPA. These regulations are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500-1508.

28.     NEPA requires that environmental information be made available to public officials and citizens before decisions are made and before actions are taken. 40 C.F.R. § 1500.1(b). The information must be of high quality, and the agency must ensure the "scientific integrity of the discussions and analyses in environmental impact statements." *Id.* § 1502.24. The purpose of these requirements is to ensure that the public has information that allows it to question, understand, and, if necessary, to challenge the decision made by the agency.

29.     NEPA requires the agencies to prepare an Environmental Impact Statement (EIS) when a major federal action is proposed that *may* significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1).

30.     An EIS is a "detailed written statement" that "provide[s] full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1502.1, 1508.11.

31.     When it is not clear whether or not an action will significantly affect the environment (and thus require preparation of an EIS), the regulations direct agencies to prepare an Environmental Assessment (EA) in order to determine whether an EIS is required. 40 C.F.R. §§ 1501.4(b), 1508.9. An EA is "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). An EA "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

32.     The NEPA regulations require the agency to consider ten "significance factors" in determining whether a federal action may have a significant impact and thus require an EIS. 40 C.F.R. § 1508.27. Among other factors, the agency must consider the beneficial and adverse impacts of the project, the effect on public health and safety, unique characteristics of the geographic area, the degree to which the action may establish a precedent for future actions, the degree to which possible effects are highly controversial, uncertain, or involve unique or unknown risks, cumulatively significant effects, the degree to which the action may adversely affect an endangered or threatened species or its habitat, and whether the proposed action will violate any laws or standards of environmental protection. *Id.* If the agency's action may be environmentally significant according to any of the criteria, the agency must prepare an EIS. *Id.*

33.     The agency implementing the project, not the public, has the burden of demonstrating that significant adverse effects will not occur as a result of the proposed project. 40 C.F.R. § 1508.13.

34.     An adequate EA must consider both direct and indirect environmental impacts of the proposed action. 40 C.F.R. § 1508.8. Direct effects are caused by the action and occur at the same time and place as the proposed project. *Id.* § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. *Id.* § 1508.8(b).

35.     NEPA additionally requires the agency to assess the cumulative effects of its proposed action on the environment. 40 C.F.R. § 1508.7. Cumulative effects are the effects resulting from the incremental impact of the proposed action when added to other past, present, and reasonably foreseeable future actions. *Id.* Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id.*

36.     For an agency's decision to be considered reasonable, a decision record and finding of no significant impact must contain sufficient analysis to show the agency's decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision made. If the agency fails to consider important aspects of the problem in its EA, its decision is arbitrary and capricious.

**The Administrative Procedure Act**

37.     The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions . . . found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2).

**Applicable BLM Regulations**

38.     BLM's regulations require a special recreation permit for any commercial or competitive use of BLM lands.  43 C.F.R. § 2932.11(a).

39.     Use of BLM land is commercial if any person, group, or organization attempts to make a profit or receive money from participants in recreational activities occurring on public lands led, sponsored, or organized by that person, group, or organization; anyone collects a fee or receives other compensation that is not strictly a sharing of actual expenses; or there is paid public advertising to seek participants.  *Id.* § 2932.5.

40.     Competitive use of BLM land includes any organized, sanctioned, or structured use, event, or activity on public land in which two or more contestants compete and participants register, enter, or complete an application for the event or there is a predetermined course or area designated for the event.  *Id.* § 2932.5.

41.     The BLM may also require a special recreation permit for recreational uses of special areas; noncommercial, noncompetitive, organized group activities; use of areas where recreation use is allocated; or use of special areas.  *Id.* § 2932.11(b).

**Applicable Forest Service Regulations**

42.     The USFS's regulations provide that "[a]ll uses of National Forest System lands, improvements, and resources . . . are designated 'special uses'" that require permits. 36 C.F.R. § 251.50.

43.     The only "special uses" that do not require a permit are: (1) those uses authorized by regulations governing sharing use of roads; (2) grazing and livestock use; (3) the sale and disposal of timber, special forest products, and minerals; (4) noncommercial, non-group (fewer than 75 people) recreational activities, such as camping, picnicking, hiking, fishing, boating,

hunting, and horseback riding; (5) noncommercial, non-group (fewer than 75 people) activities involving the expression of views, such as assemblies, meetings, demonstrations, and parades; (6) uses, other than noncommercial group uses, with nominal effects on National Forest Service lands, resources, or programs; (7) uses, other than noncommercial group uses, regulated by another state or federal agency in a manner that is adequate to protect National Forest Service lands and resources and avoid conflict with National Forest System programs or operations; and (8) routine operation or maintenance activities within the scope of a statutory right-of-way for a highway, so long as not the activity is not in a congressional designated wilderness. *Id.* § 251.50(a), (c), (e).

44.     All other Forest Service uses are "special uses" that require a permit, including but not limited to commercial uses (including uses whose primary purpose is the sale of a good or service, regardless of whether the use is intended to produce a profit), recreation events (defined as recreational activities for which an entry or participation fee is charged), and noncommercial group uses (defined as uses other than commercial uses involving a group of 75 or more people, either as participants or spectators). *Id.* §§ 251.50-51.

45.     Travel on Forest Service roads requires a permit when the travel is for the purpose of engaging in a noncommercial group use or a recreation event. *Id.* §§ 251.50. A recreation event includes any recreational activity conducted on Forest Service lands for which an entry or participation fee is charged, including events such as fishing contests. *Id.* § 251.51.

## FACTS

46.     Salmon, Idaho is situated in Lemhi County. Lemhi County consists of approximately 90% federal public lands. The federal public lands surrounding Salmon, Idaho contain some of the wildest roadless lands in the federal public lands systems. The Salmon-Challis National

Forest includes approximately 1.3 million acres of the Frank Church-River of No Return Wilderness Area (the second largest Wilderness in the lower 48), the Wild and Scenic Salmon River, breathtaking scenery, and countless rugged and remote peaks and river bends. The public lands administered by the BLM in the Salmon area include a portion of the Boulder-White Clouds Mountains, one of the largest unprotected roadless areas in the United States. These public lands and the wildlife they sustain are beloved not only by Plaintiffs, but by people from across the world who come to Idaho to hike, watch wildlife, take photographs, raft wild and scenic rivers, ride horses, and fish and hunt. Tourism in Idaho is a $3.4 billion industry, employing 26,000 Idahoans.

47.      An annual carnivore killing contest occurs on private and public lands surrounding Salmon, Idaho. The annual carnivore killing contest has in the past taken place on Forest Service lands. The annual carnivore killing contest is anticipated in the future to take place on Forest Service lands. The annual carnivore killing contest has been planned for but has not taken place on BLM lands. The annual carnivore killing contest is anticipated in the future to take place on BLM lands.

**Idaho for Wildlife's 2013 Carnivore Killing Contest**

48.      A group called Idaho for Wildlife scheduled the "1st Annual 2 Day Coyote & Wolf Derby" for December 28-29, 2013. IFW advertised the event as the first wolf-killing contest held in the United States since 1974. Two $1,000 cash prizes were offered for the participants who killed the largest wolf and the most coyotes. Children as young as 10 were invited and encouraged with prizes to participate.

49.      During the first week of December 2013, IFW sought a special recreation permit from the BLM Salmon Field Office to hold the "1st Annual 2 Day Coyote & Wolf Derby" on BLM-

managed lands in the Salmon area. BLM denied the application, advising IFW that BLM would not be able to process the application in time for the event. BLM invited IFW to submit an application six months in advance for future events.

50.     Plaintiff WildEarth Guardians and other conservation groups sought a Temporary Restraining Order to prevent the 2013 carnivore killing contest from occurring on Forest Service lands without a Forest Service "Special Use Permit" (SUP). *See WildEarth Guardians et al. v. Mark et al.,* No. 4:13-cv-533-CWD (D. Idaho).

51.     After the court denied a temporary restraining order, the "1st Annual 2 Day Coyote & Wolf Derby" was held on December 28-29, 2013 on private and Forest Service lands surrounding Salmon, Idaho. IFW specifically invited participants to hunt, and participants did hunt, on the Salmon-Challis National Forest as part of the contest. Participants used bait, calling devices, and high-tech rifles to kill carnivores as part of the contest. 230 participants killed twenty-three coyotes, but no wolves.

**Idaho for Wildlife's 2015 Carnivore Killing Contest**

52.     IFW scheduled the "2nd Annual Predator Hunting Contest and Fur Rendezvous" for January 1-4, 2015. Two $1,000 cash prizes were offered for the participants who killed the most wolves and the most coyotes. Children as young as 10 were invited and encouraged with prizes to participate.

53.     On August 7, 2014, IFW submitted an application to BLM for an SRP for a carnivore killing contest to be held annually for five years on BLM land, beginning the weekend of January 2-4, 2015.

54.     On August 7, 2014, IFW submitted an application to the USFS for an SUP for a carnivore killing contest to be held on USFS lands in the Salmon, Idaho area on January 2-4, 2015.

55.     On August 19, 2014, Charles Mark, Forest Supervisor for the Salmon-Challis National Forest, sent a letter to IFW in response to the group's SUP application informing the group that "a permit will not be issued, nor is one needed for this event."

56.     On November 13, 2014, Joe Kraayenbrink signed a FONSI and DN authorizing the issuance of an SRP to IFW to conduct a carnivore killing contest on BLM lands from January 2-4, 2015. If IFW met all requirements of the SRP in 2015, the authorization would continue for an additional four years.

57.     On November 20, 2014, IFW contacted the BLM's Salmon Field Office notifying BLM of additional modifications to the carnivore killing contest's rules and participation criteria.

58.     On November 25, 2014, Joe Kraayenbrink rescinded his November 13, 2014 decision due to the "informal and substantive modifications" made by IFW to its proposal.

59.     On December 1, 2014, several conservation organizations wrote to the Forest Service asking the USFS to take a "fresh look" at the carnivore killing contest given the modifications made by IFW to its proposal. The organizations asked USFS to notify IFW that it is not authorized to hold the carnivore killing contest on the Salmon-Challis National Forest until the Forest Service has completed a second review in light of these modifications and unless IFW obtains a permit.

60.     On January 1-4, 2015 (one day longer than was requested by IFW in its permit applications), the "2nd Annual Predator Hunting Contest and Fur Rendezvous" was held on Forest Service and private lands. IFW specifically invited participants to hunt, and participants did hunt, on the Salmon-Challis National Forest as part of the contest. Thirty coyotes were reportedly taken as part of the event, but no wolves.

61.     All hunters participating in this year's event were required to sign a waiver stating that no carnivores taken on BLM land would be eligible for the hunting contest.

62.     On January 9, 2015, Thomas Tidwell, Chief of the United States Forest Service, responded to the conservation organizations' December 1, 2014 letter, saying that while the Forest Service "share[s] your concern that events such as the proposed Derby devalue the important role that predators play in a healthy ecosystem and undercut efforts to educate the public about the importance of wolf restoration," that nevertheless "no special use permit is required for the activities currently proposed by Derby organizers or participants."

63.     IFW has expressed the intention to hold a carnivore killing contest on private, BLM, and Forest Service lands surrounding Salmon, Idaho annually.

64.     The annual carnivore killing contest requires participants to sign in and attend a rules meeting in Salmon, Idaho on the first evening of the event, followed by a weekend of killing as many wolves, coyotes, skunks, weasels, jackrabbits, raccoons, and starlings as possible on private and public lands. The contest concludes in Salmon, Idaho.

65.     The annual carnivore killing contest is a commercial event under USFS regulations. The annual carnivore killing contest is a commercial event because: 1) participants are required to register and encouraged to pay an entry fee or donation, 2) monetary and other prizes are awarded, and 3) the sponsors organize for furbuyers to be available to buy the furs of animals killed in the competition. Additional prizes are advertised for youth participants as young as 10 years old.

66.     The Forest Service's webpage lists the following examples of commercial recreation events requiring a special use permit: "animal, bicycle, motocross, or triathalon races; jeep

rallies; dog trials; *fishing contests*; rendezvous; rodeos; adventure games; youth treks; wagon trains; concerts; *and other similar events*." (emphasis added).

67.    The annual carnivore killing contest is also a group event. The annual carnivore killing contest requires hunters to participate in two-person teams. IFW seeks to have 500 participants, plus an unknown number of spectators, use public lands to hunt carnivores as part of the competition.

68.    The Forest Service's webpage lists the following examples of commercial recreation events requiring a special use permit: "weddings, church services, endurance rides, regattas, camping trips, hikes, music festivals, rallies, graduations, and races."

69.    Although IFW desires to hold the annual carnivore killing contest on BLM lands, BLM has so far refused permission for the event on BLM lands. Last year, BLM informed IFW that the event could not occur on BLM lands without a special recreation permit. This year, BLM initially issued, but subsequently rescinded, a special recreation permit for the event.

70.    Although BLM withdrew its permission for a 2015 carnivore killing contest, Plaintiffs have reason to believe that the underlying project will be revived and approved "under the cover of new paperwork." *Forestkeeper v. Benson*, 2014 WL 4193840, *7 (E.D. Cal. 2014). Plaintiffs have reason to believe that the carnivore killing contest will be approved this year using a similar environmental assessment to that drafted and withdrawn last year.

71.    The Forest Service has never required a permit, held public comment, or evaluated the impacts to wildlife and the human environment caused by the annual carnivore killing contest.

72.    The annual carnivore killing contest occurs in the middle of the holidays. During this time, many families have time off work, can recreate on public lands, and head out to test new skis, snowshoes, sleds, snowsuits, and snowmobiles. The annual carnivore killing contest

concentrates shooters on lands in three ways—in time, in place, and in purpose—to shoot as many coyotes, wolves, and other carnivores as possible during the weekend-long event in competition for cash and other prizes.

73.     Contestants in the annual carnivore killing contest use Forest Service roads to access Forest Service lands and drive their kills to Salmon, Idaho.

74.     The annual carnivore killing contest may have an effect on the greater sage-grouse. The greater sage-grouse is a candidate species for listing under the Endangered Species Act. Competitors on Forest Service lands threaten sage grouse by flushing the birds. Competitors on Forest Service lands may incidentally "take" sage grouse as that term is defined in the Endangered Species Act, for example through misidentification or misdirected aim. Competitors on BLM lands threaten sage grouse by flushing the birds. Competitors on BLM land may incidentally "take" sage grouse as that term is defined in the Endangered Species Act, for example through misidentification or misdirected aim.

**FIRST CLAIM FOR RELIEF**
**(NEPA VIOLATION)**

**BLM Failed to Disclose and Analyze the Direct, Indirect, and Cumulative Effects of the Proposed Action**

75.     Plaintiffs incorporate by reference all preceding paragraphs.

76.     The regulations implementing NEPA require the BLM to disclose and analyze the environmental effects of the proposed action. 40 C.F.R. § 1500.1(b). Specifically, the regulation explains that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

77.     In order to adequately consider the environmental consequences of the proposed action, the BLM must consider the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* §§ 1502.16, 1508.7, 1508.8, 1508.25.

78.     The Predator Hunt Derby EA and FONSI failed to adequately analyze the direct, indirect, and cumulative impacts of the contest, which involves up to 500 participants competing on public lands to kill as many wolves, coyotes, and other carnivores as possible within 3 days.

79.     The BLM concluded that the carnivore killing contest will cause no measurable increase in hunting, despite this contest's use of prizes to incentivize hunters to kill as many animals over a three-day period as possible, and despite the participation of hundreds of hunters.

80.     The BLM failed to analyze effects to local wildlife populations at the local scale, despite acknowledging that there will be effects at that scale.

81.     The BLM incorrectly treated the aggressive state legal limit for wolf harvest as a baseline for analysis of effects to wolves, even though the state's quota is insufficiently protective of the species.

82.     The BLM failed to evaluate the potential that contest hunt participants could cross state borders and illegally kill Wyoming wolves, which are protected from take under the Endangered Species Act.

83.     The EA failed to consider the direct, indirect, and cumulative effects of the carnivore killing contest with wolf hunting in neighboring states.

84.     The BLM failed to consider up-to-date science on the effect of killing wolves and coyotes on breeding, depredation incidents, ecological processes, and other factors.

85.     The BLM failed to consider the effect of the carnivore killing contest on social attitudes towards wolves, coyotes, and other carnivores, and in particular the potential for the carnivore killing contest to fuel intolerance that promotes future killing.

86.     The BLM failed to consider in its cumulative effects analysis the fact that this intensive killing event was proposed to occur every year for five years, or the effect of this five-year assault when considered with Idaho's aggressive state management.

87.     The BLM failed to consider the benefits of apex predators like wolves and coyotes on ecosystems.

88.     The BLM underestimates the cost of the event to Idaho. Even having underestimated the cost of the event, the BLM acknowledges that the socioeconomic cost of the carnivore killing contest is greater than its benefit. The BLM has thus failed to accurately disclose and appropriately analyze the socioeconomic effects of the action.

89.     The BLM's failure to address the direct, indirect, and cumulative effects of the contest on carnivores, ecosystems, and Idaho's economy is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

90.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## **SECOND CLAIM FOR RELIEF**
## **(NEPA VIOLATION)**

### **BLM Failed to Consider a Reasonable Range of Alternatives**

91.     Plaintiffs incorporate by reference all preceding paragraphs.

92.     NEPA requires that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This provision applies to the

preparation of EAs. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).

93.     The EA provided just two alternatives: the applicant's proposed action and no action. The EA failed to raise other reasonable alternatives, such as excluding sensitive areas such as Wilderness Study Areas from the event, limiting the event to a single year to give time for the BLM to analyze the event's effects before reauthorizing it, or eliminating certain types of carnivores from the carnivore killing contest such as wolves, alpha wolves, or breeding wolves.

94.     Defendant BLM's failure to consider a reasonable range of alternatives was arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

95.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

<u>**THIRD CLAIM FOR RELIEF**</u>
<u>**(NEPA VIOLATION)**</u>

**BLM Is Required to Prepare an EIS for a Carnivore Killing Contest Like That Proposed by IFW**

96.     Plaintiffs incorporate by reference all preceding paragraphs.

97.     NEPA requires the Forest Service to prepare an EIS when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

98.     In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. § 1508.27.

99.     In evaluating intensity, the agency must consider numerous "significance" factors, including, but not limited to, the degree to which the proposed action affects public health or safety, the unique characteristics of the geographic area such as proximity to ecologically critical areas, the degree to which the action may establish a precedent for future actions with significant

effects or represent a decision in principle about a future consideration, the degree to which

possible effects are highly controversial, the degree to which the action may adversely affect an

endangered or threatened species or its habitat, and whether the action threatens a violation of

Federal, State, or local law or requirements imposed for the protection of the environment. *Id.* §

1508.27(b).

100.    If the agency's action may be environmentally significant according to any of the criteria,

the agency must prepare an EIS.  If the agency's action could have several impacts that

cumulatively are significant, the agency must prepare an EIS.

101.    The carnivore killing contest as proposed significantly threatens public health and safety.

Because it is time-limited and promises prizes, the carnivore killing contest encourages

indiscriminate shooting that endangers companion animals and people. The risk is especially

high because, on a three-day holiday weekend, up to 500 contestants shoot as many as possible

of a variety of species of different sizes and different modes and speeds of travel—targeting

animals that fly, climb trees, move close to the ground, and those that lope across the ground like

dogs. The event also involves children, who are both vulnerable to injury and a danger to others

because of their inexperience. Because the event threatens public health and safety, an EIS must

be prepared.

102.    The BLM lands in the Salmon area include a portion of the Boulder-White Clouds

Mountains, one of the largest unprotected roadless areas in the United States. The BLM lands

also include 17 Wilderness Study Areas. The adjacent Salmon-Challis National Forest includes

approximately 1.3 million acres of the Frank Church-River of No Return Wilderness Area (the

second largest Wilderness in the lower 48) and the Wild and Scenic Salmon River. Given the

presence of these ecologically critical areas in and near the planning area, the BLM must prepare an EIS.

103.    The event may also have an effect on the regional population of wolves, including Wyoming wolves, which are listed under the Endangered Species Act. The planning area and adjacent areas are also home to Canada lynx, a threatened species under the Endangered Species Act. The nature of the carnivore killing contest makes it more likely that lynx or other endangered species will be accidentally taken, since hunters are targeting a range of species traveling on the ground and in the air and with different movement patterns. Given the possibility of effects to endangered species, the BLM must prepare an EIS.

104.    The proposal for a carnivore killing contest on BLM land caused an outpouring of public protest, with over 100,000 comments expressing opposition to the carnivore killing contest during the public comment period associated with BLM's NEPA analysis. The public has provided scientific and other evidence that the carnivore killing contest affects carnivore populations. By contrast, the BLM concludes that carnivore populations are not affected. This controversy mandates preparation of an EIS.

105.    The carnivore killing contest proposed on BLM land in the Salmon area creates a precedent for other carnivore killing contests on BLM land both in Idaho and beyond. Thus, BLM must prepare an EIS.

106.    Defendant BLM's failure to prepare an EIS was arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

107.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF
### (APA VIOLATION)

**The Forest Service's Decision That a Permit Is Not Required Is Arbitrary and Capricious, Not in Accordance with Law, and Made Without Observance of Procedure.**

108.    Plaintiffs incorporate by reference all preceding paragraphs.

109.    On August 19, 2014, the Forest Service determined that a special use permit is not required for the annual carnivore killing contest. The Forest Service's August 19, 2014 decision that a permit is not required for the annual carnivore killing contest is a final agency action. On January 9, 2015, the Forest Service determined that a special use permit is not required for the annual carnivore killing contest. The Forest Service's January 9, 2015 decision that a permit is not required for the annual carnivore killing contest is a final agency action.

110.    The carnivore killing contest is a "special use"—i.e., "a use of National Forest Service lands"—and therefore requires a permit. The only "special uses" that do not require a permit are: (1) those uses authorized by regulations governing sharing use of roads; (2) grazing and livestock use; (3) the sale and disposal of timber, special forest products, and minerals; (4) noncommercial, non-group (fewer than 75 people) recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding; (5) noncommercial, non-group (fewer than 75 people) activities involving the expression of views, such as assemblies, meetings, demonstrations, and parades; (6) uses, other than noncommercial group uses, with nominal effects on National Forest Service lands, resources, or programs; (7) uses, other than noncommercial group uses, regulated by another state or federal agency in a manner that is adequate to protect National Forest Service lands and resources and avoid conflict with National Forest System programs or operations; and (8) routine operation or maintenance activities within the scope of a statutory right-of-way for a highway, so long as not the activity is not in a

congressional designated wilderness. 36 C.F.R. § 251.50(a), (c), (e). Because the carnivore killing contest does not fall under any of these exceptions, a special use permit is required.

111.    All other Forest Service uses are "special uses" that require a permit, including but not limited to commercial uses (including uses whose primary purpose is the sale of a good or service, regardless of whether the use is intended to produce a profit), recreation events (defined as recreational activities for which an entry or participation fee is charged), and noncommercial group uses (involving a group of 75 or more people, either as participants or spectators). *Id.* §§ 251.50-51.

112.    Travel on Forest Service roads requires a permit when the travel is for the purpose of engaging in a noncommercial group use or a recreation event. *Id.* § 251.50.

113.    A commercial use on Forest Service lands requires a permit. *Id.* § 251.50. The killing event is a commercial use because an entry fee or donation is charged. *Id.* § 251.51. The killing event is also a commercial use because the event awards cash prizes to contestants, and contest participants are thus effectively selling their services as carnivore killers. Finally, the killing event is a commercial event because contestants sell furs from their killed animals to furbuyers. *Id.* Thus, the event's primary purpose is the sale of  goods (furs) and services (the killing of carnivores). *Id.* A special use permit is required.

114.     A recreation event on Forest Service lands requires a permit. *Id.* § 251.50. If the carnivore killing contest is not a commercial event, it is a recreation event because it is a recreational activity that requires an entry or participation fee. *Id.* § 251.51.  A special use permit is required.

115.    A noncommercial group use or activity requires a permit. *Id.* § 251.50. If the carnivore killing contest is not a commercial event or a recreational event, it is a noncommercial group use

or activity because it involves a group of 75 or more people (either as participants or spectators). *Id.* § 251.51. A special use permit is required.

116.    The Forest Service unlawfully made its decision that a special use permit was not required for the carnivore killing contest without observing the regulatory procedures in *Id.* § 251.54 for reviewing such proposed uses.

117.    The Forest Service's determination that the carnivore killing contest does not require a special use permit is inconsistent with its determination in other instances that a carnivore killing contest does require a special use permit.

118.    The Forest Service's determination that the carnivore killing contest does not require a special use permit is arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2).

119.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.


## FIFTH CLAIM FOR RELIEF
## (NEPA VIOLATION)

### The Forest Service Failed to Take a Hard Look at Impacts to the Environment

120.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

121.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. 42 U.S.C. § 4332. NEPA's implementing regulations require the USFS to analyze the direct and indirect impacts of the carnivore killing contest on USFS lands to other USFS users and to wildlife, as well as the cumulative environmental impacts when added to other past, present, and reasonably foreseeable future actions, including cumulative and similar actions, and to assess their significance. *See* 40 C.F.R. §§ 1508.25(a)(2),(3), 1508.25(c)(3), 1508.7

122.    On August 19, 2014, the Forest Service determined that a special use permit was not

required for the annual carnivore killing contest. This determination allows the annual carnivore

killing contest to occur on Forest Service lands in the Salmon area. On January 9, 2015, the

Forest Service determined that a special use permit was not required for the annual carnivore

killing contest. This determination allows the annual carnivore killing contest to occur on Forest

Service lands in the Salmon area. The Forest Service did not evaluate the environmental effects

of allowing the carnivore killing contest on Forest Service lands.

123.    The USFS violated NEPA by failing to evaluate the environmental effects of the

carnivore killing contest on USFS lands. The USFS's failure to analyze the direct, indirect, and

cumulative impacts of the carnivore killing contest was arbitrary and capricious, and constitutes

a violation of NEPA. 42 U.S.C. §§ 4321-4370h.


## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that the Bureau of Land Management's "Environmental Assessment for Predator

Hunt Derby Special Recreation Permit" (EA) and associated Finding of No Significant Impact

(FONSI) and Decision Record (DN) were in violation of the National Environmental Policy Act,

and that BLM's authorization of a Special Recreation Permit for a carnivore killing contest on

BLM lands in the Salmon, Idaho area on the basis of the EA, FONSI, and DN violated federal

law and was otherwise arbitrary and capricious.

2.      Declare that Defendant United States Bureau of Land Management must issue a special

recreation permit and comply with the National Environmental Policy Act before allowing a

carnivore killing contest on BLM lands in the Salmon, Idaho area like that proposed by Idaho for Wildlife for late December 2013 and early January 2015.

3.      Enjoin the BLM from allowing any future carnivore killing contest on BLM or lands in the Salmon, Idaho area until BLM has issued a special recreation permit and complied with NEPA.

4.      Declare that the United States Forest Service is in violation of the Administrative Procedure Act and its own regulations and guidance in failing to require a special use permit for the annual carnivore killing contest;

5.      Declare that the Forest Service violated NEPA in failing to evaluate the annual carnivore killing contest's impacts to the environment on Forest Service lands;

6.      Order the Forest Service to comply with its own regulations and guidance regarding special use permits as they apply to the annual carnivore killing contest;

7.      Enjoin the Forest Service from allowing the annual carnivore killing contest on Forest Service lands until a special use permit has been issued and environmental review pursuant to NEPA has been completed;

8.      Award Plaintiffs their costs of suit and attorneys fees; and

9.      Grant Plaintiffs such other and further relief as the Court deems just and equitable.

Respectfully submitted and dated this 30th day of January, 2015.

/s/ Celeste K. Miller
Celeste K. Miller, ISB # 2590
McDevitt & Miller, LLP
420 West Bannock
P.O. Box 2564-83701
Boise, Idaho 83702
Ph: (208) 343-7500
Fax: (208) 336-6912
ck@mcdevitt-miller.com

30 – PLAINTIFFS' SECOND AMENDED COMPLAINT

/s/ Laura King
Laura King, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
Fax: (406) 443-6305
king@westernlaw.org

/s/ John R. Mellgren
John R. Mellgren, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Plaintiffs WildEarth Guardians,
Cascadia Wildlands, Boulder-White Clouds
Council, Kootenai Environmental Alliance, and
Predator Defense*

/s/ Andrea Lynn Santarsiere
Andrea Lynn Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs Center for Biological
Diversity, Western Watersheds Project, and Project
Coyote*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 13th day of March, 2015, I filed the foregoing electronically

through the CM/ECF system, which caused the following parties or counsel to be served by

electronic means, as more fully reflected on the Notice of Electronic Filing:

Celeste Miller, Attorney for Plaintiffs
 ck@mcdevitt-miller.com, heather@mcdevitt-miller.com

John Mellgren, Attorney for Plaintiffs
mellgren@westernlaw.org

Laura King, Attorney for Plaintiffs
king@westernlaw.org

Joshua David Hurwit, Attorney for Defendants
joshua.hurwit@usdoj.gov, Kathy.Sims@usdoj.gov, pmatlock@blm.gov


/s/ Laura King
Attorney for Plaintiffs