Celeste K. Miller (ISB # 2590)
McDevitt & Miller, LLP
420 West Bannock
P.O. Box 2564-83701
Boise, Idaho 83702
Ph: (208) 343-7500
ck@mcdevitt-miller.com

Laura King, *pro hac vice* (MT Bar # 13574)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
king@westernlaw.org

John R. Mellgren, *pro hac vice* (OR Bar # 114620)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Plaintiffs WildEarth Guardians, Cascadia Wildlands, and Kootenai Env. Alliance*

Andrea Lynn Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs Ctr. for Biological Diversity, W. Watersheds Project, and Project Coyote*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**
**EASTERN DIVISION**

| | |
|---|---|
| WILDEARTH GUARDIANS ET AL.,<br><br>Plaintiffs,<br>v.<br><br>JOE KRAAYENBRINK ET AL.,<br><br>Defendants. | Case No. 4:14-cv-00488-REB<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PROTECTIVE ORDER** |

## INTRODUCTION

Defendants have not met their burden to show that the usefulness of the information they seek through document discovery outweighs the burden to the Plaintiffs of producing it. Fed. R. Civ. P. 26(b)(2)(C)(iii). Plaintiffs have responded to Defendants' Interrogatories. *See* ECF No. 33-8. Defendants fail to explain how the remaining document requests will further their *res judicata* defense, much less how any benefit to them outweighs the burden to the Plaintiffs (small nonprofit organizations), including the chilling of Plaintiffs' associational rights. We therefore request that this Court grant Plaintiffs' request for a protective order and determine that Plaintiffs have met their discovery obligations related to *res judicata* in this case.

## ARGUMENT

**I. The Burdens of Defendants' Proposed Discovery Outweigh Its Likely Benefits.**

Defendants claim that the sufficiency of their *res judicata* defense is irrelevant to whether discovery should continue. ECF No. 37 at 7. This is incorrect. The sufficiency of Defendants' *res judicata* defense speaks directly to the "importance of the discovery in resolving the issues," one of the factors the court must consider when balancing the burdens and benefits of discovery. Fed. R. Civ. P. 26(b)(2)(C)(iii).[1]

[1] Contrary to Defendants' suggestion, ECF No. 37 at 6, courts routinely bar or limit discovery if the information sought is not of sufficient potential significance to justify the burden of producing it, or if the discovery tool selected is not the most efficient means to acquire the information. *See, e.g., In re Sealed Case (Med. Records)*, 381 F.3d 1205, 1218 (D.C. Cir. 2004) (given privacy concerns, district court inappropriately allowed discovery into accused's "mental retardation records"); *St. John v. Napolitano*, 274 F.R.D. 12, 17 (D.D.C. 2011) (harm to plaintiff's privacy interests and burden of producing all medical records for a nine-year period outweighed any marginal relevance); *U.S. E.E.O.C. v. Pinal Cnty.*, 714 F. Supp. 2d 1073, 1079 (S.D. Cal. 2010) (barring litigant from conducting deposition to clarify factual information that had already been produced); *Costa v. Cnty. of Burlington*, 584 F. Supp. 2d 681, 685 (D.N.J. 2008) (inquiry into all inmates' medical grievances would be minimally probative and disproportionately intrusive; inquiry into subset of records would adequately address prison officials' indifference to plaintiff inmate's death); *Hall v. Sullivan*, 231 F.R.D. 468, 475 (D. Md.

Rule 26(b)(2)'s proportionality factors are designed to enable tailored discovery that accommodates fair disclosure without imposing undue burden and expense. *Id.* Accordingly, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly . . . ." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Because the Forest Service does not set forth a colorable *res judicata* argument, its discovery requests cannot have the value that Defendants claim of limiting or eliminating the claims or issues presented by Plaintiffs' complaint. Any benefit to Defendants is elusive and outweighed by the significant burden of discovery to Plaintiffs.

A. Defendants Fail to Show How Their Document Requests Will Help Them Prove Privity.

The Defendants insist that they are "entitled to test [Plaintiffs' interrogatory] responses through document discovery." ECF No. 37 at 14. However, Defendants fail to identify how their remaining document requests will help them "test" privity.

The Defendants are seeking documents solely to demonstrate three indicia of privity: (1) tactical maneuvering; (2) substantial participation; and (3) close relationship. ECF No. 37 at 19. As an initial matter, the Supreme Court has rejected the importance of these elements in demonstrating privity. *Taylor v. Sturgell*, 553 U.S. 880, 885 (2008). Moreover, even if the existence of these factors could demonstrate privity, Defendants' discovery requests have limited ability to demonstrate these elements.

As noted in our motion, ECF No. 33-1 at 15 n. 4, these three elements are part of the "virtual representation" test, *see Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005), which the U.S. Supreme Court has rejected as too broad. *Taylor*, 553 U.S. at 885. Under the "virtual representation" test as set forth in *Headwaters* and later addressed in *Taylor*,

---

2005) (requiring plaintiff who sought documents to demonstrate that a law firm had misrepresented its expertise to avoid disclosure of third-party files).

two factors, "identity of interests" and "adequate representation," are necessary for a finding of virtual representation, and at least one of three additional factors, "substantial participation," "tactical maneuvering," and "a close relationship," must be established. *See Headwaters* at 1052; *Taylor* at 889-90. In place of the "virtual representation" test, *Taylor* reiterates the six "established" grounds for nonparty preclusion, which cabin the doctrine to its "proper bounds." *Id.* at 893-95. These grounds include, in "limited circumstances," preclusion based on adequate representation, which requires, "at a minimum" that the interests of the nonparty and her representative are aligned, as well as procedural safeguards for the nonparty or the understanding of the original party that it was suing in a representative capacity. *Id.* at 900. The additional *Headwaters* factors that Defendants seek discovery on are not part of the *Taylor* test.

Defendants do not need (and do not purport to need) document discovery to argue adequate representation and alignment of interests. As to whether special procedures were used in the first suit to protect nonparties' interests, this is a matter of public record: as in *Headwaters*, the first suit was neither formally certified as a class action nor treated as a class action. *Headwaters* at 1056 & n. 8. Likewise, Plaintiffs' answers to Interrogatories 8 and 9 demonstrate that there was no intention on the part of the original Plaintiffs to represent the new Plaintiffs, and therefore no such intention was ever conveyed. ECF No. 33-8 at 6, 17-18, 26-27, 34-36, 44-45, 56-57. With respect to aligned interests, Plaintiffs provided a stipulation detailing the interests that they share specifically with respect to this case. Attach. 3 to ECF No. 33-4 (Santarsiere Dec.). Additionally, Plaintiff organizations' interests, priorities, visions, and mission statements are available on their websites.

Even assuming that a demonstration of tactical maneuvering, substantial participation, or close relationships could help Defendants establish privity, Defendants have access to adequate

information on these elements without further discovery. For example, Plaintiffs' interrogatory responses (specifically, Interrogatories 8 and 9) preclude "substantial participation" or "tactical maneuvering." Plaintiffs' responses show that none of the new Plaintiffs "substantially participated," or indeed, participated at all, in the original litigation, either through actual participation in the litigation, as in *Eddy v. Waffle House, Inc.,* 482 F.3d 674, 678-680 (4th Cir. 2007), or through control of it, as in *Montana v. U.S.*, 440 U.S. 147, 154 (1979). Nor did any new plaintiff engage in tactical jockeying, *i.e*. manipulation of the courts in order to create two opportunities to litigate the same issues. If Plaintiff groups had been strategizing for two bites at the apple, or controlling the litigation without being named parties, there would have been meetings between parties and nonparties or internal discussions among parties referencing the nonparties. But Plaintiffs' interrogatory responses reveal there were no such meetings, with the exception of a brief telephone call between two groups that demonstrates an absence of coordination. *See* ECF No. 33-8 at 17-18, 35-36.

The remaining factor is "close relationship." As noted above, the Supreme Court has rejected a reliance on "close relationship" to justify preclusion. *Taylor* at 898 (rejecting "close enough" theory of preclusion). *Taylor* rejected preclusion despite that the original and new plaintiffs were close associates with common organizational affiliations who shared litigation material and were represented by the same attorney. *Id.* at 889, 905. No such close relationships exist here, and furthermore, Defendants have all they need to understand Plaintiffs' relationships, including the common-interest stipulation and publicly available information on Plaintiffs' websites, such as press releases, newsletters, and media articles that reveal partner relationships. *See* ECF No. 33-5 (Cotton Dec.) at ¶ 3; ECF No. 33-6 (Bruner Dec.) at ¶ 20. Additionally, Plaintiffs have provided, via responses to Interrogatories, complete lists of their staff and board

members (which demonstrate that there is no overlap between new and original Plaintiffs), as well as lists of initiatives on which plaintiff groups have worked together.

Furthermore, the benefit of any additional information on relationships between plaintiff groups is negligible because in addition to showing adequate representation (which Defendants cannot do), Defendants must show that *every* new plaintiff group is in privity with at least one original plaintiff group. However, Kootenai Environmental Alliance's interrogatory responses indicate *no* common staff or board, organizational memberships, initiatives, or meetings with other plaintiff groups. *See* ECF No. 33-8 at 23-28. Thus, Defendants' *res judicata* argument must fail as to all plaintiff groups.

When discovery requests "approach the outer bounds of relevance and the information requested may only marginally enhance the objectives of providing information to the parties or narrowing the issues, the Court must then weigh that request with the hardship to the party from whom the discovery is sought." *Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 374 F.Supp. 1080, 1088 (D.C. Minn.1974). Here, the discovery requests would burden the organizational resources and associational freedoms of the non-profit Plaintiff organizations, compromising their ability to fulfill their missions. See ECF No. 33-3 (Fox Dec.) at ¶ 6-7, 11; ECF No. 33-6 (Bruner Dec.) at ¶ 5, 19; and ECF No. 33-5 (Cotton Dec.) at ¶ 14.

B. Defendants' *Res Judicata* Theory Is Untenable.

Defendants have not demonstrated that the issues presented in this case are identical to those decided by the Court in the first lawsuit, nor that the first lawsuit was resolved by a final judgment on the merits. The 2013 suit was based on different final agency actions arising from different nuclei of facts. Defendants question whether the differences between the 2013 and the 2015 derbies affect the issue of whether a Special Use Permit (SUP) is required for the event,

ECF No. 37 at 10. However, the changes between the 2013 and 2015 derbies are significant and may require different treatment under the Forest Service regulations.

In contrast to the 2013 event, the 2015 event was a day longer; targeted more species, including species moving in diverse ways; covered new geographic areas by allowing participants to register online from distant locations; and was couched as an annual event. ECF 33-1 at 13-14. These are not "minor, immaterial differences." ECF 37 at 11. Rather, they go directly to the question of whether the expanded 2015 event was: 1) less likely to have such "nominal effects" on Forest Service lands, such that a permit would not be required, 36 C.F.R. § 251.50(e)(1); 2) more likely to require a permit as a "group use," defined as "an activity conducted on National Forest System lands that involves a group of 75 or more people, either as participants or spectators," 36 C.F.R. §§ 251.51, 251.50(c)(1); and 3) more likely to pose safety concerns that would merit permitting.

For example, with respect to "group use," the second contest was more likely to be well-attended because participants could register from distant locations; the event had had an additional year of local and national publicity; and it was held over a long holiday weekend. Relatedly, the expanded 2015 event posed greater safety risks by inviting contestants to shoot a variety of species of different sizes and different modes and speeds of travel, including animals that fly, climb trees, and sprint low to the ground. Additionally, as an annual event, the 2015 contest posed additional indirect harms to Forest Service resources, by entrenching a hateful attitude toward wolves and coyotes, and putting the iconic animals at greater risk throughout the year. Notably, Judge Dale's 2013 decision that "Plaintiffs have not identified that they will suffer harm other than what might ordinarily occur during a successful hunting season" was explicitly

based on the fact that "there is no evidence that the event . . . will become an annual event." *WildEarth Guardians v. Mark*, 2013 U.S. Dist. LEXIS 180874, at *15.

In the 2013 case, Judge Dale's determination that a TRO was not warranted was made in light of educated guesses about what the facts actually were (there was no administrative record and no completed event), based on an event with a lighter footprint, against the extraordinarily high standard for a TRO. Judge Dale did not address the Plaintiffs' NEPA claim. Moreover, the case was not decided on the merits. The plaintiffs in that case, who voluntarily dismissed without prejudice, retained their right to seek an adjudication of the merits. *Concha v. London*, 62 F.3d 1493, 1507 (9th Cir. 1995). Accordingly, Defendants' *res judicata* defense is unsupportable, and the Court should enter the requested protective order.

**<u>II. The First Amendment Protects Plaintiffs from Discovery.</u>**

Defendants have failed to establish that the discovery requests at issue pass the Ninth Circuit's test for discovery requests implicating First Amendment infringement: that the requests be rationally related to a compelling government interest and be the least restrictive means of obtaining the desired information. *Perry v. Schwartzenegger*, 591 F.3d 1147, 1161-61 (9th Cir. 2009).[2]

Defendants state that the discovery is rationally related to a compelling government interest, simply citing their *res judicata* defense. ECF No. 37 at 15, 17. In *Perry*, the Ninth Circuit faulted the district court for simply considering whether the request was reasonably calculated to lead to the discovery of admissible evidence, under Rule 26, without consideration

[2] Defendants first argue that Plaintiffs' First Amendment claim is untimely. The caselaw cited does not provide any firm timeframe making a claim timely. As outlined above and as detailed in their attorney declarations, Plaintiffs negotiated in good faith and only realized the chilling effect that the requests would have late in the process, when they started gathering documents to respond to final discovery requests.

of the "First Amendment's more demanding heightened relevance standard." *Perry*, 591 F.3d at 1164. Defendants seek to do the same by simply citing *res judicata* but failing to "demonstrate[] an interest in obtaining the disclosures . . . which is sufficient to justify the deterrent effect . . . on the free exercise . . . of [the] constitutionally protected right of association." *Id*. (quoting *NAACP v. Alabama*, 357 U.S. 449, 463 (1958)).

Defendants also fail to show the requests at issue are the least restrictive means of obtaining the desired information. Again, they fail to respond to Plaintiffs' explanation that a wealth of the information Defendants seek is on Plaintiffs' websites. As Plaintiffs explained, the websites contain mission statements as well as archives of press releases, which Defendants may review to see if Plaintiffs were working together. They fail to acknowledge that Plaintiffs' responses to the interrogatories showed no evidence of the "tactical maneuvering" they seek to find. ECF No. 33-8 (responses, showing no relevant overlap of staff or boards and no relevant meetings between Plaintiffs). As in *Perry*, Defendants here can "obtain much of the information they seek from other sources, without intruding on protected activities." *Perry*, 591 F.3d at 1164.

Defendants claim that the requests are narrowly tailored because they "only" seek communications between Plaintiffs. But the requests cover a very broad array of topics, such as "carnivore conservation." This implicates a vast amount of materials, particularly for groups like Project Coyote, which is solely dedicated to carnivore conservation. Project Coyote would need to review every single communication it sent during the requested time period to see which communications had been sent or cc'd to any staffer of any of the relevant groups, or any listserv containing any staffer of the relevant groups. This is not narrowly tailored.

Defendants further protest that three Plaintiffs did not submit a declaration as to the chilling impact of disclosure. Defendants cite no requirement that every plaintiff in a case must

submit a declaration, and Plaintiffs can find none. It is clear from the Plaintiff staff declarations that the infringement issues affect Plaintiff groups in a similar way, and the declaration from Andrea Santarsiere states as much ("Plaintiff groups, including the Center for Biological Diversity, also remain concerned that release of sensitive documents could have a chilling effect on the operations of these Plaintiff groups . . . ."). ECF No. 33-4 (Santarsiere Dec.) at ¶ 41.

Defendants argue that Plaintiffs' concerns could be protected through a limited protective order because of their belief that the bulk of Plaintiffs' concerns were only related to the *public* receiving the information. This is incorrect. The Plaintiff declarations explained the specific harms that would result from turning the information over to the federal government. As Plaintiff Western Watersheds Project explained, "WWP focuses its work on the protection of federal public lands. As such, we often campaign against harmful land management activities proposed or conducted by the federal government." ECF No. 33-6 (Bruner Dec.) at ¶ 9. WWP is "concerned the government could use the information to obtain an unfair advantage in other matters and in the political arena." *Id*. Plaintiff WildEarth Guardians likewise explained that "[w]ere Guardians forced to disclose our emails and other communications to the federal government it would drastically impact our ability to communicate openly with our strategic partners," and likewise that she is "concerned that the government's refusal to agree to a protective order indicates its intent to use any disclosed information to an unfair advantage in future legal and political matters." ECF No. 33-5 (Cotton Dec.) at ¶ 13.

Further, the types of concerns more related to release to the general public (such as harassment from anti-wolf groups) are also implicated by releasing documents to the government. As Defendant's brief acknowledges, documents turned over to the federal government may be subject to release under the Freedom of Information Act. ECF No. 37 at18

n.10. Therefore, documents could likewise be released to anti-wolf interests, a scenario that, as the declarations explain, causes Plaintiffs to fear for their security. *E.g*., ECF No. 33-5 (Cotton Dec.) at ¶¶ 11-12. As the Ninth Circuit noted in *Perry*, while a narrow protective order may mitigate a chilling effect, "[t]he mere assurance that private information will be narrowly rather than broadly disseminated, however, is not dispositive." *Perry*, 591 F.3d at 1160 n.6 (citing *Dole v. Serv. Employees Union, AFL–CIO, Local 280*, 950 F.2d 1456, 1461 (9th Cir.1991)) ("[Union statements] exhibit a concern for the consequences that would flow from any disclosure of the contents of the minutes to the government or any government official.").

As Plaintiffs explained in their motion and accompanying declarations, Defendants' proposal for a narrow protective order is not practical or workable. Defendants propose that Plaintiffs label each document produced as private or not. This would take hundreds of hours, requiring Plaintiffs to conduct detailed screening and redaction to remove group and individual names and sensitive information. This additional work would add to the already heavy burden placed on Plaintiffs by responding to minimally useful discovery requests.

For these reasons, Defendants have failed to demonstrate that the information sought through discovery is rationally related to a compelling governmental interest, and is the least restrictive means of obtaining it. *Perry*, 591 F.3d at 1161. Therefore, Plaintiffs respectfully request this Court eliminate or substantially limit the remaining discovery requests to protect their First Amendment group association rights.

**CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that this Court grant the Motion for a Protective Order.

Respectfully submitted this 13th day of July 2015.

/s/ Laura King
Laura King, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
Fax: (406) 443-6305
king@westernlaw.org

/s/ Celeste K. Miller
Celeste K. Miller, ISB # 2590
McDevitt & Miller, LLP
420 West Bannock
P.O. Box 2564-83701
Boise, Idaho 83702
Ph: (208) 343-7500
Fax: (208) 336-6912
ck@mcdevitt-miller.com

/s/ John R. Mellgren
John R. Mellgren, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Plaintiffs WildEarth Guardians, Cascadia Wildlands, and Kootenai Environmental Alliance*

/s/ Andrea Lynn Santarsiere
Andrea Lynn Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs Center for Biological Diversity, Western Watersheds Project, and Project Coyote*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of July, 2015, I filed the foregoing document electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Andrea Lynn Santarsiere asantarsiere@biologicaldiversity.org, celkins@biologicaldiversity.org

Celeste K Miller ck@mcdevitt-miller.com, heather@mcdevitt-miller.com

Christine Gealy England christine.england@usdoj.gov, Danielle.Narkin@usdoj.gov

John R Mellgren mellgren@westernlaw.org

Joshua David Hurwit joshua.hurwit@usdoj.gov, Ardis.Robinson@usdoj.gov, Kathy.Sims@usdoj.gov, pmatlock@blm.gov

Laura King king@westernlaw.org

/s/ John Mellgren
John Mellgren