Natalie J. Havlina (ISB # 7498)
Law Office of Natalie J. Havlina
P.O. Box 1675
Boise, ID 83701
Ph: (208) 473-1277
havlinalaw@gmail.com

Laura King, *pro hac vice* (MT Bar # 13574)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
king@westernlaw.org

John R. Mellgren, *pro hac vice* (OR Bar # 114620)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Plaintiffs WildEarth Guardians, Cascadia Wildlands, and Kootenai Env. Alliance*

Andrea L. Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs Ctr. for Biological Diversity, W. Watersheds Project, and Project Coyote*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## EASTERN DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS ET AL., | Case No. 4:14-cv-00488-REB |
| Plaintiffs, | |
| v. | |
| JOE KRAAYENBRINK ET AL., | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIMS AGAINST THE U.S. FOREST SERVICE** |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

GLOSSARY OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      Idaho for Wildlife's 2013 Killing Contest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Idaho for Wildlife's 2015 Killing Contest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      The Forest Service's failure to require a permit is unlawful. . . . . . . . . . . . . . . . . . . 7

      A.      The killing contest is a "special use." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.      The killing contest is a "group use." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.      Alternatively, the killing contest is a "commercial use." . . . . . . . . . . . . . . . . . 13

      D.      The killing contest is a "group use" or a "recreation event" involving the use of

            National Forest System roads. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.      The Forest Service must disclose and analyze the environmental effects of the killing

      contest pursuant to the National Environmental Policy Act. . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

**LIST OF EXHIBITS**

EXHIBIT A          2013 Indiana Predator Challenge Coyote/Fox Killing Contest (USFS Permit and Operating Plan)

EXHIBIT B          2014 Indiana Predator Challenge Coyote/Fox Killing Contest (USFS Permit and Operating Plan)

EXHIBIT C          Extreme Predator Callers Club Campout and Shooting Competition (USFS Permit and Operating Plan)

EXHIBIT D          Cowboy Action Shooting Match (USFS Permit)

EXHIBIT E          Letter from Steven K. Beverlin (Acting Forest Supervisor, Malheur National Forest) to Duane Freilino (JMK Farms)

EXHIBIT F          Letter from Corbin Newman (Regional Forester, Southwestern Region)

# GLOSSARY OF ABBREVIATIONS

APA – Administrative Procedure Act

BLM – Bureau of Land Management

EA – Environmental Assessment

EIS – Environmental Impact Statement

IFW – Idaho for Wildlife

NEPA – National Environmental Policy Act

SOF – Statement of Facts

# INTRODUCTION

Defendants Charles Mark and the U.S. Forest Service (collectively "Forest Service") have twice authorized a vocal anti-wolf group called Idaho for Wildlife ("IFW") to stage a private competitive hunting "derby" to kill wolves, coyotes, and other wildlife on public lands in the Salmon-Challis National Forest without the special use permit required by 36 C.F.R. § 251 and without any environmental analysis. The Idaho contest is the first competitive wolf shoot in the United States since 1974, when wolves came under Endangered Species Act protections, Statement of Facts ("SOF") ¶ 15, and is held in an area that has been deemed "core refugia" for wolves by the Fish and Wildlife Service, SOF ¶ 1. This killing contest has caught the attention of the public nationwide, with the Bureau of Land Management ("BLM") receiving approximately 95,000 comments opposing it. *See* BLM, Decision Record for the Predator Hunt Derby Environmental Assessment ("EA") at 1-2. The BLM, meanwhile, has determined that the contest does require a permit and has so far declined to allow the contest on BLM-managed lands. Despite these facts, the Forest Service has provided IFW with blanket permission to hold the unprecedented and highly controversial killing contest on the Salmon-Challis National Forest annually without a permit or environmental analysis, and without soliciting any public comment on the event.[1]

# STANDARD OF REVIEW

Plaintiffs' claims alleging violations of the National Environmental Policy Act ("NEPA") and the regulations governing Forest Service permitting are reviewed under the Administrative

---

[1] Plaintiffs concurrently file the Declarations of Louise Wagenknecht, George Wuerthner, Kenneth Cole, Julie Dalsaso, Josh Laughlin, and Margaret Clay to establish that Plaintiffs have suffered injury-in-fact, caused by the Forest Service, that can be redressed by this Court, and therefore have standing to prosecute this litigation. *See WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).

Procedure Act ("APA"), 5 U.S.C. § 706(2). *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). In reviewing the Forest Service's decisions here, the Court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), and set aside the agency's determinations if it finds them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2).

While this review is ordinarily deferential, no deference is warranted when an agency's interpretation is plainly erroneous. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012); *see also, e.g., Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (withholding deference where agency's interpretation was inconsistent with the regulation). Additionally, when the agency's interpretation of a regulation conflicts with a prior interpretation, there is reason to suspect that the new interpretation does not reflect the agency's "fair and considered judgment," and no deference is warranted. *Christopher*, 132 S. Ct. at 2166.

## BACKGROUND

The Forest Service manages more than 192 million acres of public lands. SOF ¶ 20. There is a significant and growing demand for a variety of uses on these lands. *Id.* Currently, the Forest Service authorizes 74,000 special uses, in over 180 categories. *Id.* In addition to more permanent commercial uses such as concessions, these special uses include a variety of short-lived events that may be either commercial or noncommercial, such as animal, bicycle, motocross, and triathlon races; group camping, hikes, and horseback rides; jeep rallies; dog trials; fishing contests; rendezvous; rodeos; adventure games; youth treks; wagon trains; concerts; and demonstrations and assemblies. *Id.* Recent events that have undergone special use permitting include a coyote- and fox-killing competition in Indiana (February 1-3, 2013) (Ex. A), (February 7-9, 2014) (Ex. B); a club campout and shooting competition sponsored by Extreme

Predator Callers in Arizona (April 25-27, 2014) (Ex. C); and a "Cowboy Action Shooting Match" in Arizona (September 24, 2014) (Ex. D).[2]

The Salmon-Challis National Forest includes some of the wildest public land in the nation, including a million acres of designated Wilderness, the Wild and Scenic Salmon River, and countless rugged peaks and remote river bends. SOF ¶ 1. It provides core refugia for wolves and other wildlife, and the wildlife it sustains are beloved by people from around the world who come to Idaho to hike, view wildlife, take photographs, raft rivers, ride horses, fish, and hunt. *Id.*

**Idaho for Wildlife's 2013 Killing Contest**

In December 2013, the public learned that an organization called Idaho for Wildlife was planning a competitive wolf- and coyote-killing contest on private and federal land near Salmon, Idaho. SOF ¶ 2. Children as young as 10 were invited and encouraged with prizes to participate. *Id.* The contest included an entry fee for the participants and offered cash prizes for the largest wolf killed and the largest and most coyotes killed. *Id.*

IFW did not seek a Forest Service "special use permit" to use federal lands managed by the Forest Service for the contest. SOF ¶ 3. On December 17, 2013, several conservation organizations alerted the Forest Service to IFW's unauthorized special use of the Forest. *Id.* The

---

[2] Plaintiffs respectfully request that the Court take judicial notice of the Forest Service permits/operating plans for these events (attached as Exhibits A-D), which were obtained by Plaintiff WildEarth Guardians through a Freedom of Information Act request. The Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2). The Ninth Circuit has recognized that a court may take judicial notice of matters of public record, including agency records. *See Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010) (caselaw in the circuit "does not prevent us from taking judicial notice of the agency's own records"); *Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1113 n.14 (9th Cir. 2010) (taking "judicial notice of [] public documents" authored by BLM); *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) ("a court may take judicial notice of 'records and reports of administrative bodies'").

Forest Service then "review[ed] the proposed Derby" but determined that the event would not require a permit as a "commercial" event or "recreation" event, reasoning that the contest would not occur "on" the National Forest. SOF ¶ 4. The Forest Service reasoned that the organized event did not consist of hunting wildlife on the National Forest, but instead solely involved presenting dead animals to judges off the National Forest, in Salmon, Idaho. *Id.* The Forest Service did not address whether the contest was a "group event" requiring a permit. *Id.*

On December 23, 2013, the conservation organizations filed a complaint and a motion for a temporary restraining order to prevent the 2013 killing contest from occurring on Forest Service lands. SOF ¶ 5. The same day, the event organizers withdrew the entry fee. *Id.* On December 27, 2013, Magistrate Judge Candy Dale denied Plaintiffs' motion.[3] SOF ¶ 6.

The "1st Annual 2 Day Coyote & Wolf Derby" was held on December 28-29, 2013 on lands surrounding Salmon, Idaho. SOF ¶ 7. IFW specifically invited participants to hunt, and participants did hunt, on the Salmon-Challis National Forest as part of the contest. The plaintiffs voluntarily dismissed their lawsuit against the Forest Service without prejudice on January 16, 2014. SOF ¶ 9. About three weeks after the 2013 killing contest in Idaho, the Forest Service determined that a permit *would* be required for a similar contest in Oregon. SOF ¶ 8.

**Idaho for Wildlife's 2015 Killing Contest**

On August 7, 2014, IFW applied to the Salmon-Challis National Forest for a special use permit for a "predator hunting" event to be held on Forest Service lands in the Salmon, Idaho area on January 2-4, 2015. SOF ¶ 10. IFW expected 150 to 200 participants. *Id.*

---

[3] The Forest Service also filed a Motion to Dismiss in the case, but that motion was never decided. SOF ¶¶ 6, 9.

On August 19, 2014, Forest Supervisor Charles Mark responded to IFW's application, stating that "a permit will not be issued, nor is one needed for this event." SOF ¶ 11. While noting that "[t]he commercial aspect of this event is the payment of a fee," he determined that the event "does not involve commercial activity or an organized commercial recreation event on NFS land." *Id.* As in 2013, he explained that this was because the fee was "to enter a competition involving presentation of wildlife that has been taken by legal, recreational hunting to a judge in the Town of Salmon, who awards prizes if certain criteria are met." *Id.* As in 2013, Supervisor Mark did not address whether the contest would need to be permitted as a "group event." *Id.*

On December 1, 2014, several conservation organizations asked the Forest Service to take a "fresh look" at the killing contest in light of modifications made to the contest proposal by IFW. SOF ¶ 12. The letter recounted that IFW had submitted applications to both the Forest Service and to BLM for its 2015 killing contest; BLM had determined that a Special Recreation Permit was required to hold the event on BLM-managed lands; BLM had begun processing a permit and had prepared an EA for the event, pursuant to NEPA; BLM initially approved the event; however, because of "material and substantive" changes made to IFW's proposal, BLM withdrew its approval of the permit. *Id.* The organizations asked the Forest Service to notify IFW that it was not authorized to hold the killing contest on the Salmon-Challis National Forest until the Forest Service had completed a second review in light of the "material and substantive" modifications to the proposal that prompted BLM's withdrawal of its permit, and unless IFW obtained a permit. *Id.*

IFW advertised the "2nd Annual Predator Hunting Contest and Fur Rendezvous" for January 1-4, 2015 (one day longer than IFW requested in its permit application). SOF ¶ 13. Two $1,000 cash prizes were offered for the participants who killed the most wolves and the most

coyotes, and once again youth-specific prizes were offered to encourage children as young as 10

to participate. *Id.* Licensed fur buyers would be available on site to pay cash for furs. *Id.*

Participants were encouraged to donate in lieu of paying an entry fee. *Id.*

On the weekend of January 1-4, 2015, the second killing contest took place on the

Salmon-Challis National Forest and private lands near Salmon, Idaho. SOF ¶ 15. On January 9,

2015, the Forest Service denied the conservation groups' December 1, 2014 request for a "fresh

look," stating that it "share[ed] [thei]r concern" that the killing contest "devalue[s] the important

role that predators play in a healthy ecosystem and undercut[s] efforts to educate the public about

the importance of wolf restoration," but that "no special use permit is required for the activities

currently proposed by Derby organizers or participants." SOF ¶ 16. The Forest Service also

indicated—for the first time—that it had determined that the contest was not a group use. *Id.*

Chief Tidwell explained:

> There are often 75 or more people on National Forests at the same time who are
> participating in shared or similar activities, but that does not, in and of itself,
> make them a 'group' for purposes of the regulation. For example, at any given
> time there may be more than 75 elk hunters, trout fisherman [sic], or campers on a
> National Forest, but these are not the types of 'groups' subject to the regulation if
> they are not congregated in one location.

SOF ¶ 16. Notably, the Forest Service's statement that no permit is required for activities as

"currently proposed" would seem to provide blanket permission for future events that conform to

the 2014 proposal.

## **ARGUMENT**

The Forest Service's decision to authorize the killing contest as proposed by IFW without

a permit is arbitrary and capricious because it conflicts with the regulations promulgated

pursuant to the agency's Organic Act, 16 U.S.C. § 551, and is inconsistent with the Forest

Service's determinations that special use permits are required for similar events. The Forest

Service also violated NEPA in failing to analyze the environmental impacts of the contest.

I.      **The Forest Service's failure to require a permit is unlawful.**

The Forest Service is required to protect the natural resources of the National Forest,

including by allocating limited capacity among diverse user groups. *See* 16 U.S.C. § 551 (Forest

Service has a duty to protect the National Forests against "depredations," including by regulating

their use); *cf. Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1046-47 (9th Cir. 2007)

(agency may deny specific recreational use in order to balance competing historical, cultural, and

recreational needs). To this end, the Forest Service requires "special use" permits to regulate and

mitigate impacts from special uses of the forest. *See* 36 C.F.R. §§ 251.50, 251.56.

A.      **The killing contest is a "special use."**

The special use requirement is broadly framed, encompassing all uses of National Forest

System lands, with specific and narrow exceptions: "*All* uses of National Forest System lands . . .

except those authorized by the regulations governing sharing use of roads . . . ; grazing and

livestock use . . . ; the sale and disposal of timber and special forest products . . . ; and minerals .

. . are designated as 'special uses.'" 36 C.F.R. § 251.50(a) (emphasis added). Section 241.50(c)

further exempts from the permit requirement "noncommercial recreational activities, such as

camping, picnicking, hiking, fishing, boating, hunting, and horseback riding." 36 C.F.R. §

251.50(c). Congress's enumeration of the specific types of activities that are exempt from special

use authorization demonstrates its intent to provide only a limited exemption from the special use

regulation. *Everett v. U.S.*, 980 F. Supp. 490, 493 (D.D.C. 1997), *aff'd,* 158 F.3d 1364 (D.C. Cir.

1998). "All" other uses require a permit.

The killing contest is different than noncommercial recreational hunting, and thus is not the kind of permit-exempt recreational activity contemplated by the regulations. The killing contest is an organized event involving time limits, cash prizes, and hundreds of participants, and has a greater impact on forest resources than recreational hunting.[4] Thus, the killing contest is a "special use" that does not fall into any of the regulation's enumerated exceptions, and therefore requires a permit.

**B.       The killing contest is a "group use."**

"A special use authorization is not required for noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding . . . *unless* the proposed use is a noncommercial group use." 36 C.F.R. § 251.50 (emphasis added). A "group use" is "an activity conducted on National Forest System lands that involves a group of 75 or more people, either as participants or spectators." 36 C.F.R. § 251.51. As a group activity involving more than 75 participants and spectators, *see* SOF ¶ 10 (application to Forest Service contemplated 150-200 participants), the killing contest requires a special use permit.

The Forest Service reasoned that the killing contest is not a "group use" because "75 or more people . . . participating in shared or similar activities . . . are not the types of 'groups' subject to the regulation if they are not congregated in one location." SOF ¶ 16. The plain

---

[4] Hunters and state regulatory agencies agree that killing contests are not typical, recreational hunting. It is the Department of Fish and Game's ("IDFG") policy that "the Department will not support any contests or similar activities involving the taking of predators which may portray hunting in an unethical fashion, devalue the predator, and which may be offensive to the general public." Predation Management Plan for the Lolo and Selway Elk Zones, IDFG, 14 (Revised Dec. 13, 2011), https://idfg.idaho.gov/wildlife/management-plans. As Jim Posewitz, a lifelong hunter who worked for Montana Fish Wildlife and Parks from 1961-1993 and who is the preeminent voice in ethical hunting, has said: "Hunting is not a contest between humans. . . . Trying to kill the "big buck" to win a contest or a monetary prize . . . represents pursuing and killing wildlife for the wrong reasons." *Beyond Fair Chase: The Ethic and Tradition of Hunting* 98 (1994).

language of the regulation suggests no such limitation. *Reno v. Nat'l Transp. Safety Bd.*, 45 F.3d

1375, 1379 (9th Cir. 1995) (plain language governs). Nor did the Forest Service intend the

regulation to apply so narrowly.

   To define "group use," the Forest Service chose a numerical threshold, not an assessment

based on activity type. Land Uses and Prohibitions, 60 Fed. Reg. 45258-01, 45270 (August 30,

1995). The Forest Service explained:

> The Department recognizes that any numerical threshold is arbitrary in that a
> group of 74 people could have as much impact on forest resources as a group of
> 75, and that 25 people could have more impact than 100, depending on the type of
> activity and the characteristics of the site. Nevertheless, the Department believes
> that a numerical threshold is the fairest and most objective standard for
> applicability of the rule . . . .

*Id.* at 45270.

   The Forest Service also explained what it meant by "a group": 75 or more individuals

who arrive on the Forest "as part of a particular group or in connection with an organized

activity." 60 Fed. Reg. at 45,270. The Forest Service made clear that the distance between

individuals within a group was not determinative; instead, the relevant inquiry was whether 75 or

more people arrived on the national forest in connection with an organized event. For example, a

group of 75 campers would be subject to the group use provision "even if they intend to camp far

apart from each other." *Id.* By contrast, 75 people who reserve campsites individually in the

same area would not be a "group." *Id.* Tellingly, the Forest Service rejected a commenter's

suggestion that it should handle group uses by designating sites for public assemblies, like the

National Park Service does. Such an approach is not "practicable or necessary," the Forest

Service said, explaining that it oversees a broad variety of uses across 169 million acres "with

primarily expansive, undeveloped resources" and has a multiple-use mandate, while "to a

significant degree, public use of National Park Service land is concentrated," the Park Service

oversees a smaller amount of land, and the Park Service has a preservation mandate. *Id.* Thus, the Forest Service determined that requiring permits for group uses as defined by number of participants and group identity—rather than designating sites for group use or defining group uses by type of activity—was a sensible way to handle the diverse uses that the Forest Service oversees.

Moreover, the plain language of the regulation—which governs, *see Reno*, 45 F.3d at 1379—does not say that groups are not subject to the regulation if they are not congregated in one location. Again, the regulation simply defines "group use" as "an activity conducted on National Forest System lands that involves a group of 75 or more people, either as participants or spectators." 36 C.F.R. § 251.51. The Ninth Circuit has rejected a previous attempt to insert a novel requirement, such as the requirement of "congregation," into the plain language of the "group use" regulation. In *Black v. Arthur*, the Ninth Circuit rejected the proposition that the "group use" regulation applies only to groups with "an internal governing structure":

> "Group use" is defined in the regulations as "an activity conducted on National Forest System lands that involves a group of 75 or more people, either as participants or spectators." 36 C.F.R. § 251.51. It is undisputed that Rainbow Family gatherings involve more than 75 people. The Rainbow Family's internal governing structure, or lack thereof, is not relevant to whether such gatherings fall within the scope of § 251.51.

201 F.3d 1120, 1122 (9th Cir. 2000). Similarly, whether users are "congregated" in one location is irrelevant; if an activity on Forest System lands involves 75 or more people—whether they arrive on the Forest together or simply "in connection with an organized activity"—that is a "group use" under the plain language of the regulation. 60 Fed. Reg. at 45,270.

Even assuming the "group use" regulation applies only to "congregated" or "concentrated" groups—which it does not—the event does involve a congregation of people near Salmon, Idaho. Although not explicitly limited, the contest is practically limited to the area

around Salmon: most participants will register in Salmon, drive a short distance onto public lands surrounding Salmon to hunt, and check in and attend closing ceremonies in Salmon. SOF ¶ 14.

Moreover, the killing contest raises the kinds of concerns that the permitting process is designed to address. Noncommercial recreation permits are "issued as a means to allocate capacity and/or disperse use, protect natural and cultural resources, provide for the health and safety of visitors, and to help cover the higher costs for providing specialized services." Federal Lands Recreation Enhancement Act: Forest Service Interim Implementation Guidelines (issued April 25, 2005), at 11, *available at* http://www.fs.fed.us/passespermits/docs/final-guidelines.pdf [hereinafter "REA Guidelines"])[5]; *see also* 36 C.F.R. § 251.56(a)(1)(i)-(ii) (special use permitting process involves development of terms and conditions designed to, among other things, protect other users and the environment and efficiently manage the land).

The killing contest raises concerns about allocation of Forest lands. The presence of hundreds of coyote hunters on the landscape may keep other recreationists away. The killing contest also threatens the safety of other Forest visitors. Contest participants kill "for fun" in a party-like atmosphere involving hundreds of participants. SOF ¶¶ 10, 11. The contest encourages participants to "hurry up, shoot first, and shoot often," because prizes are promised and the contest is held over the compressed timeframe of a weekend. SOF ¶ 13. Notably, the contest is geared towards children, who have limited experience with guns and are thus both vulnerable to injury and a danger to others. SOF ¶ 14 ("true nature" of event to "introduce young people to the hunting and fishing sports"); *Id.* ¶ 10 (event centered on "family"); *Id.* ¶ 13 (prizes for children

---

[5] For the reasons noted above in footnote 2, we respectfully request that the Court take judicial notice of this public agency record.

as young as 10). Because the contest brings hundreds of prize-motivated hunters to the lands

surrounding Salmon to kill for fun, or out of spite, the risk is heightened that participants may

accidentally injure themselves, young participants, or other users of the Forest, or kill pets or

non-target wildlife. *See* Decl. of Louise Wagenknecht at ¶¶ 11-13, 17, 19-22. By contrast, these

risks are generally not high with ordinary, recreational hunting.

      The killing contest also impacts the two target species, coyotes and wolves. In contrast to

an ordinary hunting season, the contest causes an intense burst of killing over a weekend. The

opportunity to view coyotes and wolves in or near the Salmon-Challis National Forest may be

considerably reduced by such a concentrated, targeted contest. *See* Decl. of Josh Laughlin at ¶¶

14-15; Decl. of Kenneth Cole at ¶¶ 45-49; Decl. of Margaret Clay at ¶ 10; Decl. of George

Wuerthner at ¶¶ 34-37; Decl. of Louise Wagenknecht at ¶ 26.

      The special use permitting process can consider these concerns around allocation of

capacity, public safety, and wildlife, and address them as needed through permit terms and

conditions. With respect to threats to wildlife, permitting conditions might include a prohibition

on contest activities in sensitive areas, the elimination of certain animals from the contest, *see,*

*e.g.,* Ex. A at 4, or upper limits on the number of animals allowed to be killed. Safety-focused

terms and conditions might include monitoring, advisories to other Forest users, or staffing of

emergency personnel. REA Guidelines at 12. For example, for a 4-day coyote and fox hunting

competition on National Forest lands in Indiana, the Forest Service required: (1) that hunters post

notices if they plan to hunt near recreation sites or campsites; (2) that hunters carry a cell phone;

(3) that organizers and "conservation officers" patrol the event, armed with a list of "each man,

his vehicle description, and his cell phone number"; and (4) that three firemen and two

paramedics be at hunter gatherings. Ex. A (Indiana Predator Challenge Permit and Operating

Plan)[6] at 7, 9.[7] Members of the public using the Salmon-Challis National Forest during the contest should be granted similar protections through permit provisions.

### C.    Alternatively, the killing contest is a "commercial use."

A permit is required for "a commercial use or activity," defined as "any use or activity on National Forest System lands (a) where an entry or participation fee is charged, or (b) where the primary purpose is the sale of a good or service, and in either case, regardless of whether the use or activity is intended to produce a profit." 36 C.F.R. § 251.51. The killing contest meets the "commercial" use definition.

At the time the Forest Service determined that no permit was required for the contest, the Forest Service believed that IFW would be charging an entry fee. SOF ¶ 11. Despite this, the Forest Service made the arbitrary and capricious determination that no permit was required. *Id.* In the end, IFW decided to solicit donations in lieu of entry fees for the 2015 contest, SOF ¶ 13, apparently to avoid permitting and with the expectation that solicited donations would generate as much or more money as an entry fee. The Forest Service violated the law when it allowed IFW to disguise the entry fee as a donation in order to evade the permitting requirement. *See, e.g., Hinton v. Mainlands of Tamarac,* 611 F. Supp. 494, 496 (S.D. Fla. 1985) (clubhouse may not avoid copyright royalties merely by calling the admission price for a performance a "donation"); *Schoger Found. v. Comm'r of Internal Revenue*, 76 T.C. 380, 380 (1981) (lodge may not avoid taxes by labeling itself a "religious retreat facility," where it operates in a commercial manner similar to a vacation resort, including by seeking fees through suggested "donations").

---

[6] For the reasons noted above in footnote 2, we ask the Court to take judicial notice of this public agency record.

[7] Plaintiffs have numbered these documents for ease of reference.

The killing contest is also a commercial event because its "primary purpose is the sale of a good or service." 36 C.F.R. § 251.51. First, a primary purpose of the event is the sale of furs from animals killed during the contest. Second, cash prizes are awarded to incentivize the killing of coyotes and wolves. Idaho depends upon "licensed hunting and trapping by private individuals" as the primary tool to manage predator populations. SOF ¶ 17. IFW essentially offered to pay participants, via cash prizes, to help with this goal. *Id.*

Notably, the Forest Service's justification for not requiring a permit despite the presence of an entry fee is illogical. (The Forest Service did not even address whether the event's "primary purpose is the sale of a good or service.") While noting that "[t]he commercial aspect of this event is the payment of a fee," the Forest Service determined that the 2015 killing contest "does not involve commercial activity or an organized commercial recreation event on NFS land." SOF ¶ 12. The Forest Service explained that the fee was "to enter a competition involving presentation of wildlife that has been taken by legal, recreational hunting to a judge in the Town of Salmon, who awards prizes if certain criteria are met." *Id.*

Nothing in the regulations or in agency guidance could allow the Forest Service to claim that the relevant activity is the narrow portion of the contest—the presentation of dead animals—that occurs off the Forest. The Tenth Circuit has rejected the idea that an individual may avoid special use permitting by holding one part of an activity off Forest Service lands. *U.S. v. Brown*, 200 F.3d 710, 713-14 (10th Cir. 1999). The regulation at issue in *Brown,* 36 C.F.R. § 261.10(c), requires a special use permit for "selling or offering for sale" any merchandise or conducting a work activity on the Forest. In *Brown*, the Court found that a permit was required where the defendant delivered snowmobiles to customers on Forest Service lands, although money changed hands off Forest Service lands. *Id.* The Court found that the act of "selling or offering for sale" or

"conducting a work activity" could not be segmented into two parts—exchanging money and delivering goods—with one part being conducted off the Forest to avoid permitting. The Court in *Brown* looked to the Eighth Circuit's interpretation of the same regulation:

> [i]f an interpretation of the regulation were . . . as restrictive as the defendant urges, the entire purpose of the regulation would be defeated. An individual could bypass all the requirements that are part of the special use permit simply by storing his [equipment] outside the Forest Service boundaries and hauling them on the Forest Service after the negotiations had been completed.

*Id.* (quoting *United States v. Richard*, 636 F.2d 236, 237 (8th Cir. 1980)).

Likewise, the Forest Service may not claim here that the killing contest is not "a commercial use or activity" because prizes are awarded or an entry fee is collected off the Forest boundary, ostensibly for a "presentation of wildlife" contest. Under this theory, event organizers could avoid permitting merely by ensuring that any entry fee or cash prize for an activity on the Forest is exchanged off the Forest. If that were the case, the purposes of the regulation, including to promote public safety and protect Forest resources, would be undermined. *See* 16 C.F.R. § 251.50(e)(1); 16 C.F.R. § 251.56(a)(1)(ii); REA Guidelines at 11.

Moreover, the Forest Service cannot claim deference to its interpretation of "commercial use" because the agency has been internally inconsistent. *See Christopher*, 132 S. Ct. at 2166 (new agency interpretation that conflicts with an earlier one may indicate an absence of fair and considered judgment). Less than two weeks after the conclusion of the 2013 killing contest on the Salmon-Challis National Forest, the Forest Service determined that a permit *was* required for a predator-killing contest on the Malheur National Forest in Oregon, even though it identified "an extremely low possibility" that hunting would even take place on the Malheur. Ex. E (Letter

from Steven K. Beverlin to Duane Freilino).[8] The Forest Service determined that because the contest "charges entry fees and cash awards are given, this use would be defined as commercial *and* competitive under 36 CFR 251." *Id.*; *see also* Ex. F (Letter from Corbin Newman, Regional Forester, Southwestern Region, USFS (November 15, 2012)) (advising applicant that a special use permit would be required for a coyote-killing contest if an entry fee is charged).

> **D.      The killing contest is a "group use" or a "recreation event" involving the use of National Forest System roads.**

A special use permit is also required for a "noncommercial group use" or a "recreation event" involving the use of National Forest System roads. 36 C.F.R. § 251.50(d)(1). Here, contestants use Forest roads to access hunting areas. As described above, the contest is a "group use." It is also a "recreation event," defined as "a recreational activity conducted on National Forest System lands for which an entry or participation fee is charged, such as animal, vehicle, or boat races; dog trials; fishing contests; rodeos; adventure games; and fairs." 36 C.F.R. § 251.51. As detailed above, the organizers collected entry fees via solicited "donations," so the killing contest is "a recreational activity." Moreover, the killing contest is logically no different than a "fishing contest." SOF ¶ 14 (letter from Steve Alder, noting that the event follows the tradition of fishing contests). Accordingly, should this Court determine that the killing contest is noncommercial in nature, it is still a "group use" involving the use of National Forest System roads for which a special use permit is required. 36 C.F.R. § 251.50(d)(1). Further, should the Court determine that the killing contest charges an entry fee, as argued above, the event constitutes a "recreation event" involving the use of National Forest System roads for which a

---

[8] For the reasons noted above in footnote 2, we respectfully request that the Court take judicial notice of this public agency record. (This letter is misdated January 14, 2013. The letter was actually sent on January 14, 2014 in contemplation of an event to be held on January 18-19, 2014.)

special use permit is required. *Id*. The Forest Service should require a permit for the killing

contest in order to serve the purposes of this provision: to provide the public with a market value

return for use of Forest roads, which provide access to Forest amenities such as wildlife, and to

mitigate traffic and safety concerns. Land Uses; Special Uses Requiring Authorization: Final

Rule, 69 Fed. Reg. 41,946-01, 41948 (July 13, 2004).

## II.     The Forest Service must disclose and analyze the environmental effects of the killing contest pursuant to the National Environmental Policy Act.

NEPA is our nation's "basic charter for protection of the environment." 40 C.F.R. §

1500.1. Under NEPA, the Forest Service is charged with broad environmental protection

responsibilities, including acting as trustee of the environment for future generations, assuring

safety for users of public lands, avoiding degradation of public lands, and preserving natural

aspects of our national heritage (including iconic native species such as wolves). 42 U.S.C. §

4331. Congress established procedures to implement these substantive duties, including the

direction at 42 U.S.C. § 4332(2)(C) requiring agencies to present a detailed statement on the

environmental impact of any "major federal action significantly affecting the quality of the

human environment." Such a statement aids the agency in determining whether or under what

mitigating conditions a proposed action should proceed. If this Court determines that the Forest

Service erred by failing to require a permit for the killing contest, it should also require the

Forest Service to comply with NEPA. [9]

---

[9] Even if the Court determines that no permit is required, the Court should still find that compliance with NEPA is required. According to the Council on Environmental Quality, "major federal actions" include actions by nonfederal actors—like Idaho for Wildlife—"with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Additionally, "[a]ctions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." *Id.* "[F]ederal inaction

NEPA's implementing regulations require the Forest Service to analyze the direct and indirect impacts of the carnivore killing contest on Forest Service lands to other Forest Service users and to wildlife, as well as the cumulative environmental impacts when added to other past, present, and reasonably foreseeable future actions, and to assess their significance. *See* 40 C.F.R. §§ 1508.25(a)(2),(3), 1508.25(c)(3), 1508.7.

Federal permitting of the killing contest triggers NEPA because it is a "major federal action" and may "significantly [affect] the quality of the human environment." 42 U.S.C. § 4332(C). "If a federal permit is a prerequisite for a project with an adverse impact on the environment, issuance of that permit constitutes major federal action and the federal agency involved must conduct an EA and possibly an EIS [Environmental Impact Statement] before granting it." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 644 (9th Cir. 2014) (quotations and citations omitted); s*ee also* 40 C.F.R. § 1508.18 (actions approved by federal permit are one of the traditional categories of federal action). Whether an action is "significant" turns on its "context" and "intensity." 40 C.F.R. § 1508.27. CEQ regulations establish ten factors to guide the intensity determination. 40 C.F.R. § 1508.27(b)(1)-(10). Where questions arise as to the "significance" of the federal action, the agency may first prepare an EA. 40 C.F.R. §§ 1501.4(b), 1508.9.

---

can count as federal action for purposes of triggering the EIS requirement under NEPA" where actions of a nonfederal actor "are clearly subject to [federal] control and responsibility." *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996). The question of whether there is a major federal action turns on "whether [the Forest Service] either has exercised control over [the killing contest] or has the authority and duty to do so." *Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988). By failing to apply special use permitting when required, the Forest Service abdicated its mandatory duties under 16 U.S.C. § 551 and 16 U.S.C. § 528 to protect the Forest, its resources (including wildlife), and its users, and thus NEPA was triggered.

Here, the proposed action will have a significant adverse effect on predators, 40 C.F.R. § 1508.27(b)(1); will significantly threaten public safety, as explained above, *id.* § 1508.27(b)(2); occurs in a area that has been identified by the U.S. Fish and Wildlife Service as core refugia for wolves and other wildlife, SOF ¶ 1, and therefore has "unique characteristics," *id.* § 1508.27(b)(3); is highly controversial, with over 95,000 people publicly opposing the contest, *id.* § 1508.27(b)(4); is likely to establish a precedent for Forest Service handling of similar killing contests, which are common and proliferating throughout the West, *id.* § 1508.27(b)(6); and has significant cumulative impacts, especially when added to Idaho's aggressive wolf sport hunting and management program, and other killing contests in the region, *id.* § 1508.27(b)(7).

Indeed, the killing contest's controversial nature alone mandates preparation of an Environmental Impact Statement ("EIS"). *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) ("Agencies must prepare environmental impact statements whenever a federal action is 'controversial.'"). During the BLM's NEPA process (which served as the sole outlet for public protest on this project because the Forest Service did not invite any public comments through NEPA or otherwise), approximately 95,000 comments received by the BLM expressed opposition to the event. BLM, Decision Record for the Predator Hunt Derby EA at 1-2. This level of opposition indicates an "outpouring of public protest" indicative of controversy. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (85% of 450 comments is a "volume of negative comment" that is "more than sufficient to meet the 'outpouring of public protest'" discussed in *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir.1992)).

In particular, the public, including Plaintiffs, provided scientific and other evidence demonstrating that the killing contest will affect carnivores. The contest increases the risk of

wolf- and coyote- killing not just during the three- or four-day event but throughout the year by fostering intolerance to wolves and carnivores generally. More than mere hunting, the contest is an organized event fostering anti-wolf and anti-carnivore sentiment. Indeed, it is intended as an opportunity to teach anti-wolf sentiment to children. SOF ¶ 15. Public hostility to wolves led to the extirpation of the species from the Northern Rocky Mountains in the 1930s. SOF ¶ 21. Wolf conservation efforts continue to be undermined by the human intolerance for wolves that is encouraged by this and similar contests. *Id.* In determining that no permit is needed for the event, the Forest Service dismissed the effect of the event on carnivores. Such a discrepancy mandates preparation of an EIS. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (where the public raises significant effects, and the agency responds that the extent of those effects is unknown, controversy exists and an EIS must be prepared).

The Forest Service's decision to allow the killing contest on public lands is a major federal action significantly affecting the quality of the human environment. Compliance with NEPA is required.

## CONCLUSION

For the reasons specified above, we respectfully request that this Court (1) declare that the Forest Service is in violation of the APA and its own regulations in failing to require a special use permit for the killing contest; (2) declare that the Forest Service violated NEPA in failing to evaluate the killing contest's impacts to the environment; (3) order the Forest Service to comply with its own regulations regarding special use permits as they apply to the killing contest; and (4) enjoin the Forest Service from allowing the killing contest on Forest Service lands unless and until a special use permit has been issued and environmental review pursuant to NEPA has been completed.

Respectfully submitted and dated this 1st day of July, 2016.

/s/ Laura King
Laura King, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
Fax: (406) 443-6305
king@westernlaw.org

Natalie J. Havlina (ISB # 7498)
Law Office of Natalie J. Havlina
P.O. Box 1675
Boise, ID 83701
Ph: (208) 473-1277
havlinalaw@gmail.com

/s/ John R. Mellgren
John R. Mellgren, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Plaintiffs WildEarth
Guardians, Cascadia Wildlands, and
Kootenai Environmental Alliance*

/s/ Andrea Lynn Santarsiere
Andrea Lynn Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs Center for Biological
Diversity, Western Watersheds Project, and
Project Coyote*

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2016, I filed a copy of this document

electronically through the CM/ECF system, which caused all ECF registered counsel to be

served by electronic means, as more fully reflected on the Notice of Electronic Filing.

<u>/s/ Laura King</u>
Laura King