WENDY J. OLSON, ID STATE BAR NO. 7634
UNITED STATES ATTORNEY
**CHRISTINE G. ENGLAND, CA STATE BAR NO. 261501**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1414
Email:  Christine.England@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, CASCADIA WILDLANDS, BOULDER-WHITE CLOUDS COUNCIL, KOOTENAI ENVIRONMENTAL ALLIANCE, PREDATOR DEFENSE, CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT AND PROJECT COYOTE,<br><br>        Plaintiffs,<br><br>  v.<br><br>JOE KRAAYENBRINK, in his official capacity; UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency; CHARLES A. MARK, in his official capacity; and UNITED STATES FOREST SERVICE, a federal agency,<br><br>        Defendants. | Case No. 4:14-CV-00488-REB<br><br>**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 80)** |

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 2

    State Regulation of Hunting in Idaho ...................................................................... 2

    2013 and 2015 Wolf Derbies .................................................................................. 3

ARGUMENT .................................................................................................................. 4

I.    Plaintiffs lack standing. .......................................................................................... 4

    A.    Plaintiffs have failed to show any risk of imminent future injury. ........................ 5

    B.    Plaintiffs have failed to prove any concrete injury traceable to the Forest Service that will be redressed by a favorable decision. ....................................................... 6

        1.    Plaintiffs have not established that the Derbies affected wolf or coyote populations or that a favorable ruling will redress that injury. ................... 6

        2.    Plaintiffs' hypothetical safety concerns do not support standing here. ...... 8

II.    The Forest Service's regulations did not require Idaho for Wildlife to obtain a permit for the 2013 or 2015 Derby. ................................................................................ 10

    A.    The Forest Service reasonably interpreted its own regulations to determine that no permit was required for the 2013 or 2015 Derby. ................................................. 11

        1.    The Derbies did not involve a noncommercial group use. ...................... 12

        2.    The Derby did not involve a commercial use or recreation event. ........... 13

    B.    Plaintiffs' extra-record documents support the Forest Service's determination that no permit was required for the 2013 and 2015 Derbies. ...................................... 14

    C.    Even if Plaintiffs' extra-record documents show any inconsistencies, the Forest Service's interpretation of its own regulations is entitled to deference. .............. 15

III.    Plaintiffs' NEPA claim fails because there was no major federal action. ........................ 16

IV.    The injunctive relief plaintiffs seek is not appropriate. .................................................. 18

    A.    The APA does not permit review of discretionary agency enforcement action. .. 18

    B.    A permit may not be required if the Forest Service determines that a future derby is adequately regulated by a state agency. .......................................................... 19

    C.    Injunctive relief is not in the public interest. ....................................................... 20

CONCLUSION .............................................................................................................. 20

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT -**

## INTRODUCTION

This is Plaintiffs' second attempt to enjoin a privately-organized, state-regulated hunting contest.  Ironically, this lawsuit (like the prior action) is not directed at the private organization (Idaho for Wildlife) or the State of Idaho, but solely at the federal government.  Plaintiffs' first attempt to obtain relief against the Forest Service was correctly rejected in *WildEarth Guardians v. Mark*, No. 13-CV-00533-CWD, 2013 WL 6842771 (D. Idaho Dec. 27, 2013) ("*Wolf Derby I*").  Plaintiffs offer no additional admissible evidence to support their position here.  The Court should follow the reasoning of Magistrate Judge Dale, deny Plaintiffs' motion for summary judgment (ECF No. 80) and grant the Forest Service's cross-motion.

Plaintiffs claim that the Forest Service has violated its regulations and the National Environmental Policy Act ("NEPA") by failing to require a permit for privately-organized predator hunting contests held on December 28-29, 2013 (the "2013 Derby") and on January 1-4, 2015 (the "2015 Derby").  Plaintiffs then ask the Court to enjoin the Forest Service from "allowing" any as-yet unscheduled, hypothetical future derbies.  The Forest Service had no involvement with the 2013 or 2015 Derbies, participants hunted on both private and public lands, and no wolves were killed.  Yet, rather than sue the State of Idaho or the Derby's organizers, Plaintiffs chose to sue only the federal government.

The Court should deny Plaintiffs' motion and grant the Forest Service's cross-motion for summary judgment because (1) Plaintiffs lack standing:  they cannot show any concrete injury, traceable to the Forest Service that will be redressed by a favorable decision from this Court; (2) the Forest Service's reasonable interpretation that its regulations do not require a permit for contests that did not involve the use of National Forest land is entitled to substantial deference; (2) NEPA does not apply in the absence of "major federal action"; and (4) injunctive relief is not

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 1**

appropriate where the cited regulations do not require the Forest Service to exercise its discretionary enforcement authority.

## FACTUAL BACKGROUND

**State Regulation of Hunting in Idaho**

The Salmon-Challis National Forest (the "Forest") covers over 4.3 million acres in east-central Idaho.  Combining it with other adjacent national forests, there are over ten million acres of National Forest land surrounding Salmon, Idaho, in addition to State, Bureau of Land Management ("BLM") and private lands.  (Declaration of Charles Mark ("Mark. Decl.") ¶ 11, FSAR 00124.)  Forest Service regulations require special use authorizations for many activities that take place on the Forest.  Hunting, however, is expressly listed as a recreational activity for which no pre-authorization or federal permit is required.  *See* 36 C.F.R. § 251.50(c); *see also* 36 C.F.R. § 261.8(a).  Instead, pursuant to a century of tradition and the statutes that empower Forest Service to manage National Forests, hunting occurs in National Forests but is regulated by the states.  *See* 16 U.S.C. § 528 (Multiple Use and Sustained Yield Act of 1960) (stating that nothing in the act "shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests"); 16 U.S.C. § 1604(e)(1) (National Forest Management Act of 1976) (incorporating same).

When wolves were removed from Endangered Species Act protections in Idaho on May 5, 2011, Idaho began regulating the hunting of wolves.  The Idaho Legislature enacted a wolf management plan to support that delisting.  (Declaration of Thomas Keegan, Ph.D. ("Keegan Decl.") ¶ 8, FSAR000129.)  Licensed hunting and trapping by private individuals or groups is the primary way that the State controls wolf populations.  (*Id.* ¶ 10, FSAR000129.)  To manage wolf populations, the Idaho Department of Fish and Game established "wolf

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 2**

management zones" and set harvest limits for these zones.[1]  In doing so, it sought to achieve

delisting objectives, *i.e.*, maintaining the required population and breeding pair numbers, and

bring wolf populations into balance with other big game species (including elk), reduce attacks

on livestock and domestic animals, and prevent wolves from encroaching on populated areas.

(*Id.* ¶ 16, FSAR000130.)  In past years, wolf harvest limits have not been reached.  (Keegan

Decl. ¶ 17, FSAR000130-131.)[2]  Coyotes, on the other hand, may be hunted without limit, by

any person with an Idaho hunting license.  (Keegan Decl. ¶ 6, FSAR000128.)[3]

**2013 and 2015 Wolf Derbies**

In December 2013, a non-profit hunting organization, Idaho for Wildlife ("IFW"),

sponsored a "Coyote and Wolf Derby," in Salmon, Idaho.  *Wolf Derby I*, at *1.  The 2013 Derby

offered prizes to any hunters who might shoot and kill wolves or coyotes during a specified time

period.  *Id.*  IFW indicated that hunting could take place on National Forest, state or private

lands, but did not control or limit where contestants could take game.  *Id.*  The Forest Service

determined that no activities associated with the 2013 Derby required a special use permit.  *Id.*

Plaintiffs sought a temporary restraining order to prohibit the Forest Service from

allowing the 2013 Derby to occur without special use authorization.  *Wolf Derby I*, at *1.

Magistrate Judge Dale denied Plaintiffs' motion for a temporary restraining order, finding that

Plaintiffs had not demonstrated a likelihood of success on the merits that Forest Service

regulations required special use authorization.  *Id.* at *3.  The 2013 Derby proceeded as planned,

---

[1]      The Forest sits in parts of four different wolf management zones.  (Keegan Decl. ¶ 14,
FSAR000130.)

[2]      (*See also* Idaho Fish and Game 2015-2016 Hunting/Trapping Season Wolf Harvest
Quota, *available at* https://idfg.idaho.gov/hunt/wolf/quota.)

[3]      (*See also* Idaho Upland Game, Furbearer and Turkey 2016 & 2017 Seasons and Rules at
44, *available at* https://idfg.idaho.gov/sites/default/files/seasons-rules-upland-2016-2017.pdf.)

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 3**

with approximately 26 hunters participating.  (Declaration of Steve Alder ¶ 3.)[4]  No wolves were killed.  (*Id.* ¶ 5.)

In January 2015, IFW sponsored a second hunting contest in Salmon.  The Forest Service determined that none of the activities associated with the 2015 Derby required a special use permit.  (FSAR000198199.)  The Chief of the Forest Service concurred in the Forest Supervisor's analysis, determining that no permit was required.  (FSAR000327.)  Approximately 86 hunters participated.  (Alder Decl. ¶ 7.)  Again, no wolves were killed during the 2015 Derby.  (*Id.* ¶ 8.)

IFW did not hold a hunting contest in Salmon during the 2015-2016 winter season.  (Alder Decl. ¶ 10.)  IFW does not plan to hold a hunting contest for the 2016-2017 winter season.  (*Id.* ¶ 11.)  IFW has not yet determined whether to hold another derby in the more distant future.  (*Id.* ¶ 12.)

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING.

Each of eight Plaintiffs must establish standing to sue under Article III.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  To obtain declaratory or injunctive relief, Plaintiffs must demonstrate an "imminent future injury."  *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2012) (citing *Summers v. Earth Island Institute,* 555 U.S. 488, 493 (2009)).  Each Plaintiff must set forth "specific facts" by affidavits or otherwise to support each of the three elements of standing: (1) that it has suffered "injury in fact;" (2) that the injury is fairly traceable to the challenged action of the Forest Service; and (3) that it is likely, as opposed to merely speculative,

---

[4]    The Forest Service submits the Declaration of Steve Alder ("Alder Decl.") to contest Plaintiffs' standing.  *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin*., 117 F.3d 1520, 1528 (9th Cir. 1997).

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 4**

that the injury will be redressed by a favorable decision.  FED. R. CIV. P. 56(e); *Lujan*, 504 U.S. at 561; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Here, none of the Plaintiffs meet their burden.[5]

### A.    Plaintiffs have failed to show any risk of imminent future injury.

For declaratory or injunctive relief, Plaintiffs must prove that there is a substantial likelihood of future injury.  "In order to have standing to seek injunctive relief, a plaintiff must demonstrate a likelihood of repeated injury or future harm to the plaintiff in the absence of the injunction." *Whitaker v. Garcetti*, 11 F. App'x 921, 922 (9th Cir. 2001); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (a plaintiff does not have standing to seek an injunction where "there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury.") (citation and quotation marks omitted).  Similarly, "[P]laintiffs' failure to establish a likelihood of future injury [] renders their claim for declaratory relief unripe." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999).  Although Plaintiffs' standing declarations attempt to show how they will be harmed by some future derby,[6] Plaintiffs have offered no evidence that a future derby is reasonably likely.  Instead, the Declaration of Steve Alder establishes that IFW did not hold a derby for the 2015-2016 season, does not plan to hold a derby for the 2016-2017 season, and has not determined whether it will hold another derby in the more distant future.  (Alder Decl. ¶¶ 9-11.)  Plaintiffs have not proved that they have standing to obtain the relief they seek.

---

[5]     Five of six Plaintiffs have offered evidence, but failed to meet their burden.  Plaintiff Project Coyote has offered no specific evidence to support its standing.

[6]     *See, e.g.,* Declaration of Josh Laughlin, ECF No. 80-13, ("Laughlin Decl.") ¶ 14 ("If the killing contest goes forward . . . ."); Declaration of George Wuerthner, ECF No. 80-14, ("Wuerthner Decl. ¶ 33") ("I will be injured in several ways if the . . . SCNF allow another predator-killing derby to occur.").

**B.     Plaintiffs have failed to prove any concrete injury traceable to the Forest Service that will be redressed by a favorable decision.**

Plaintiffs also fail to establish a "concrete and particularized" injury that is "actual or imminent, not conjectural or hypothetical," that is traceable to the Forest Service, and that will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Plaintiffs collectively allege two primary categories of purported injury that they may suffer if another derby is held: (1) injury to the wolf and coyote populations; and (2) safety concerns. (*See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment, ECF No. 80-1, ("Pls' Mem.") at 12.)  Their allegations are insufficient to confer standing here.

**1.     Plaintiffs have not established that the Derbies affected wolf or coyote populations or that a favorable ruling will redress that injury.**

All Plaintiffs allege injury based on hunting itself.  (*See, e.g.*, Declaration of Kenneth Cole, ECF No. 80-11, ("Cole Decl.") ¶¶ 45-50; Wuerthner Decl. ¶¶ 34-37.)  They complain that a future derby will reduce the numbers of coyotes and wolves in the Forest for them to enjoy. But Plaintiffs have not shown that the 2013 or 2015 Derby had any effect on wolf or coyote populations or that a future derby is likely to do so.  Nor can they:  during the 2013 and 2015 Derbies *no wolves were killed*.  (Alder Decl. ¶¶ 5, 8.)

Furthermore, Plaintiffs' concerns that their opportunities to view coyotes and wolves may be diminished (if the wolf and coyote populations are diminished) are likewise insufficient.  The "'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  *Sierra Club v. Morton*, 405 U.S. 727, 735-36 (1972).  Here, Plaintiffs do not show that their members were injured by past Derbies or will be injured by some future derby.  For example, one declarant asserts that she travels to the Forest in "spring and/or early summer."  (Declaration of Margaret Clay, ECF No. 80-9 ("Clay Decl."), ¶ 7.)  Another declarant states that he plans "to continue to visit the Salmon-Challis Forest . . . for

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 6**

the foreseeable future." (Laughlin Decl., ¶ 11.)  These kinds of vague assertions do not establish

a harm that is that is fairly attributable to the Forest Service (as opposed to Idaho's hunting

regulations).  Plaintiffs have not shown that their members have concrete plans to visit the Forest

during any past or hypothetical future derby.  Nor have they demonstrated that it is likely that

their opportunity to view wolves will be diminished.  What they allege is a generalized potential

for injury.  This is insufficient.  *See Reudiger v. U.S. Forest Serv.*, 427 F. Supp. 2d 974, 982-83

(D. Or. 2005) (finding that plaintiffs failed to demonstrate standing where they established only a

"generalized injury" that might result from increased traffic and noise instead of providing

"specific facts showing that they will be injured by the project").

Even if Plaintiffs were to prevail against the Forest Service, an injunction would not

remedy their alleged injuries because it would not stop hunting or even a future derby.  As one

Plaintiff declarant explains, "[a]n authorized wolf hunt on these lands is already provided

through Idaho Fish and Game."  (Declaration of Julie Dalsaso, ECF No. 80-12 ("Dalsaso

Decl."), ¶ 20.)  Another declarant mistakenly assumes that wolves taken during a derby would be

in addition to the harvest limits imposed by the State.  (Clay Decl. ¶ 10.)  This lawsuit does not

challenge the State of Idaho's wolf harvest limits, coyote hunting regulations or other sponsored

wolf hunts.  Thus, this case is like others where courts have found that attempting to stop only

one aspect of a population control effort is insufficient to confer standing.  *See, e.g., Lujan*, 504

U.S. at 570-71; *Goat Ranchers of Or. v. Williams*, 379 F. Appx. 662, 663 (9th Cir. 2010) (finding

no standing where the state could continue a cougar culling program even if the plaintiffs

prevented federal participation); *WildEarth Guardians v. U.S. Dep't of Agric.*, No. 12–cv–00716,

2013 WL 1088700, at *5 (D. Nev. Mar. 14, 2013) (finding plaintiff lacked standing where state

agency would carry out program to kill predators even if federal agency was not involved); *Wolf*

*Recovery Fndtn. v. U.S. Forest Serv.*, 09-cv-00686-BLW, ECF No. 90 at 203 (D. Idaho

Jan. 21, 2012) (vacated after settlement) (finding no standing to challenge federal wolf control

program that would not affect the State of Idaho's ability to kill wolves).[7]  Any alleged decline in

the wolf or coyote populations would be due to the State's regulations – not the Forest Service's.

A favorable ruling will not address those regulations.

> **2.      Plaintiffs' hypothetical safety concerns do not support standing here.**

Two Plaintiffs assert that one of their members did not feel safe near Salmon during a

Derby and will not feel safe during a future derby.[8]  WWP's declarant states that she "did not

leave [her] yard" during the 2015 Derby, due to safety concerns.  (Wagenknecht Decl. ¶ 17.)

Even assuming that this means that she otherwise would have left her yard *and* gone onto the

Forest during the 2015 Derby, WWP still does not have standing.[9]  Because the Forest offers

millions of acres for hunters and recreationalists to coexist, the fear of stray bullets or seeing an

animal being shot is speculative, not well-founded.  *Cf. Libertarian Party of Los Angeles Cnty. v.*

*Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (where a plaintiff refrains from expressive activity due

to a challenged regulation, self-censorship must be based on "an actual and well-founded fear").

---

[7]      Without foundation, Plaintiff Kootenai Environmental Alliance ("KEA") also asserts
injury based on "risks to soils."  (Dalsaso Decl. ¶ 18.)  But like any alleged risks to the wolf and
coyote population, this risk would exist regardless of any remedy provided through this litigation
because hunting will still occur on the Forest.  Furthermore, Ms. Dalsaso fails to explain why
there is a risk to soil during the coldest part of the year when the roads and ground will be mostly
frozen.  (*See* FSAR000320.)

[8]      Center for Biological Diversity (Clay Decl. ¶ 14); Western Watershed Project ("WWP")
(Declaration of Louise Wagenknecht, ECF No. 80-10 ("Wagenknecht Decl."), ¶¶ 17, 19, 20).
KEA also alleges generalized "safety risks."  (Dalsaso Decl. ¶¶ 10-12.)

[9]      It is unclear how much of the declarant's fear comes from her concern that Derby
contestants would hunt on BLM land – a concern unrelated to the Forest Service's determination
not to require a permit.  (*See* Wagenknecht Decl. ¶ 17.)

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 8**

Additionally, WWP's declarant does not link her fears to any action or inaction by the Forest Service.  She explains that she was shaken when she "inadvertently witnessed a dead wolf being checked in [by hunters pursuant to state regulation] at the [Idaho Department of] Fish & Game office in Salmon"—*i.e.*, not on the Forest.  (Wagenknecht Decl. ¶ 8.)  This goes to show that her asserted fears are traceable to State-regulated hunting, not to the Forest Service's determination that no permit was required for the 2013 or 2015 Derbies.  For good or bad, seeing dead animals and signs of hunting is a fact of life in and around Salmon, including on the Forest.

Plaintiff KEA similarly claims, without foundation, that "safety risks posed by this event are different and greater than those of an ordinary hunting season."  (Dalsaso Decl. ¶ 11.)  For the reasons set forth in the Forest Service's motion to strike, this conjecture is not admissible under the Rules of Evidence.  (Forest Service Mem. In Support of Its Motion to Strike, ECF No. 84 ("FS Motion to Strike"), at 8-9.)  Further, this is not the "actual or imminent" as opposed to "conjectural or hypothetical" injury required to support Article III standing.  *See Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  As Magistrate Judge Dale found,

> Plaintiffs fear the behavior of the hunters may be different because the derby is encouraging a large group of hunters to invade the forest over a condensed time period, as well as encouraging competitive hunting . . . Plaintiffs have not presented specific evidence to support their fear.  Rather, Plaintiffs' declarations provide only generalized fears regarding their safety, the safety of others, and the safety of the environment that is no different than what may occur during any use of the forest.  There is insufficient evidence that the competitive nature of the derby will alter or interfere with the ability of law enforcement (both state and federal) to enforce the hunting laws, and the regulations regarding use of the forest.  *Wolf Derby I*, at *4.[10]

Plaintiffs have offered no additional evidence here to support their fears.

---

[10]    Plaintiffs' asserted injury based on the public perception of hunters and predators that the event creates (*see, e.g.*, Wuerthner Decl. ¶ 39-40; Laughlin Decl. ¶ 14), is likewise not well-founded.  As with the other injuries they assert, Plaintiffs offer no evidence that injuries to these interests are somehow different for a future derby than for wolf hunting, in general.

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 9**

Furthermore, this fear would exist regardless of any remedy provided by this Court. Individuals will still be entitled to hunt on the Forest even if they cannot participate in the Derby. And, as Mr. Mark and Dr. Keegan explained, the number of hunters afield during the Derby (topping out at 86 during the 2015 Derby) is far fewer than the thousands of hunters afield during the annual, and far lengthier, fall deer and elk seasons.  (*See* Keegan Decl. ¶ 18, FSAR000131-132; Mark Decl. ¶ 10, FSAR000124-125; Alder Decl. ¶¶ 4, 7.)  In other words, regardless of this dispute, Plaintiffs' members will have to share the Forest with hunters just as they always do.[11]

Because Plaintiffs have not demonstrated a concrete harm traceable to the Forest Service, that would be redressed by a favorable ruling, the Court should dismiss for lack of standing.

## II.   THE FOREST SERVICE'S REGULATIONS DID NOT REQUIRE IDAHO FOR WILDLIFE TO OBTAIN A PERMIT FOR THE 2013 OR 2015 DERBY.

If Plaintiffs establish standing, Plaintiffs' claims are reviewed under the APA, 5 U.S.C. § 701, *et seq*.  *See Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).  Under the APA, judicial review of federal agency actions is "deferential." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  A court may set aside an agency action only if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "[T]he [Forest] Service is entitled to substantial deference to its interpretation of its own regulations." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003) (citation omitted). "Indeed, judicial review of an agency's interpretation of its own regulations is limited to

---

[11]     *Accord Wolf Derby I*, at *4 ("Plaintiffs' general description of their collective fear for their safety and that of their families and pets because of the two-day event does not describe a fear different than what would otherwise occur during hunting season in general.  Hunting is legal, authorized, and encouraged during this same time period regardless of derby participation.").

ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation." *Forest Guardians*, 329 F.3d at 1097 (citation omitted).

> A.    **The Forest Service reasonably interpreted its own regulations to determine that no permit was required for the 2013 or 2015 Derby.**

When the Forest Service receives a proposal, the agency must first determine if a special use authorization is required.  In evaluating whether a special use permit is required, the Forest Service considers whether the proposed activity involves a use of National Forest land, improvements, or resources, and whether the proposed activity fits one of the enumerated exceptions to the requirement for a special use authorization.  FSAR000190; 36 C.F.R. § 251.50(a).  If the proposed activity will not take place on National Forest land, or if it falls under one of the enumerated exceptions, no permit is required, and the proposal receives no further processing.  *Id*

Forest Supervisor, Charles Mark, determined that no permit was required for the 2013 and 2015 Derbies because the Derbies did not involve the use of National Forest land, improvements, or resources.  (FSAR000190; FSAR000198.)  As Mr. Mark explained, Derby participants were not

> paying organizers to go onto the National Forest to hunt, and organizers are not offering equipment or services to facilitate hunting on the National Forest. Participants in the derby may hunt anywhere they wish, they are not limited to an area on NFS land, nor are they being specifically invited to an area of NFS land.

(FSAR00198.)  Mr. Mark concluded, the "derby is an event confined to a business location in the Town of Salmon, and involves the award of prizes to hunters who bring animals taken during noncommercial recreational hunting activities to that business location to compete for prizes." (FSAR00197; *see also* FSAR000191.)  Mr. Mark's interpretation of the Forest Service special use regulations and his determination that the Derbies did not involve the use of National Forest land are entitled to substantial deference.

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 11**

Plaintiffs' contentions that the Derbies required a permit as a "noncommercial group use," "commercial use" or "recreation event" fail to address Mr. Mark's conclusion that the Derbies did not constitute a "use of National Forest System lands, improvements and resources." We address these contentions below.

### 1.     The Derbies did not involve a noncommercial group use.

Under 36 C.F.R. § 251.50(c), "special use authorization is not required for noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, *hunting*, and horseback riding . . . unless the proposed use is *a noncommercial group use*." (emphasis added).  A "group use" is an "activity conducted *on National Forest System lands* that involves a group of 75 or more people."  36 C.F.R. § 251.51 (emphasis added).  Again, the threshold determination under Section 251.51 is whether the activity is conducted on National Forest land.

First, it is unknown how many of the Derby participants actually hunted on the Forest. Fewer than 75 hunters participated in the 2013 Derby.  (Alder Decl. ¶ 4.)  In 2015, while there were slightly more than 75 participants (*id.* ¶ 7), there is no evidence that more than 75 of them hunted on the Forest.  But even if more than 75 of the participants did hunt on the Forest, the Forest Service has reasonably interpreted the "noncommercial group use" rule as applicable to "congregations of . . . people."  *United States v. Masel*, 54 F. Supp. 2d 904, 913 (W.D. Wis. 1999); *see also* Forest Service Handbook § 2709.11 at 24-27 (explaining application and approval process).[12]  The rule "is directed not at expression, but at the *congregation of large*

---

[12]     *Accord Wolf Derby I*, at *4 ("[T]he derby hunt is not like a foot race or ski race, where organizers would require the use of a loop or track for all participants to race upon.  Rather, hunters will be dispersed throughout the forest, hunting at their own pace and in their own preferred territory, and not in a prescribed location within a designated perimeter.  The hunters may hunt anywhere they wish—whether on public (Idaho state managed) lands, private lands, or USFS managed lands, as long as they follow Idaho state hunting regulations.  There is no

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 12**

*numbers of people in the forest*." *Masel*, 54 F. Supp. 2d at 913 (emphasis added).  As the Forest

Service explained when this rule was adopted, the rule was based on the need to manage the

environmental impacts arising from concentrated events (*e.g.*, sanitation hazards.  *See* 60 Fed.

Reg. 45258-01, 45259, 45262 (Aug. 30, 1995) (noting that problems with noncommercial group

use "are attributable to the size of groups, the concentration of people in a given area, and the

physical intensity of the use").  Here, these concerns do not apply.  Indeed, it is undisputed that

the Derbies were not confined to National Forest land, it is unknown how many participants

entered the more than 10 million acres of National Forest surrounding Salmon, Idaho, and the

participants were not confined or concentrated in one discrete area of the 4.3 million-acre Forest.

### 2. The Derby did not involve a commercial use or recreation event.

While not abandoning their "*noncommercial* group use" argument, Plaintiffs in the same

breath irreconcilably claim that the Derbies required special use authorization as "*commercial*

uses."  "Commercial use or activity" is defined as:

> any use or activity *on National Forest System lands* (a) where an entry or
> participation fee is charged, or (b) where the primary purpose is the sale of a good
> or service, and in either case, regardless of whether the use or activity is intended
> to produce a profit.  36 C.F.R. § 251.51.

Again, the threshold inquiry is whether the activity is "on National Forest System lands," which

as explained above, the Derbies were not.  In any event, no fee was charged for either Derby.

(FSAR000071, FSAR000050.)[13]

Plaintiffs, however, contend that the Derbies were commercial events or recreation events

---

evidence that there will be a concentration of hunters any greater over this two-day period than
experienced at other peak time periods during the hunting season.").

[13]    Plaintiffs' claim that the event was a commercial use because "a primary purpose of the
event is the sale of furs," (Pls' Mem. at 14) is without merit.  They do not, and cannot, contend
that "*the* primary purpose of the event" was the sale of furs, as required by 36 C.F.R. § 251.51.

because IFW initially proposed charging a fee, and then "disguised" that fee as a voluntary

donation.  (Pls' Mem. at 13.)  Even if a fee had been charged, it would have been paid to enter

the competition in town, to present lawfully taken game from any location, and to compete for

prizes; not to allow entry onto the Forest to hunt.  Thus, no permit would be required even if

event organizers required a fee for hunters to participate in the contest.

Plaintiffs' citation to *United States v. Brown*, 200 F.3d 710 (10th Cir. 1999) is inapposite.

As Magistrate Judge Dale explained:

> the private promoters of the derby are not offering merchandise for sale.  Rather,
> they are encouraging the use of the forest for a lawful activity---hunting---and, to
> compete for prizes, the derby participants must return to Salmon to claim them.
> None of the judging, awarding of prizes, or viewing of the animals will be on
> USFS lands. Only hunting will occur there.  The entry fee, if charged, is not being
> charged to gain hunting privileges, and the derby is not a profit making venture
> capitalizing on the use of the forest as was the[use] in *Brown*.  *Wolf Derby I*, *4.

Plaintiffs' contention that the Derbies were "commercial" uses should be rejected.

## B.    Plaintiffs' extra-record documents support the Forest Service's determination that no permit was required for the 2013 and 2015 Derbies.

Plaintiffs offer six extra-record exhibits in an attempt to show that the Forest Service's

determinations that no permit were required for the private Derbies are inconsistent with other

forests' treatment of similar events.  For the reasons set forth in the Forest Service's Motion to

Strike, no extra-record evidence should be considered in this record-review case.  (FS Motion to

Strike at 2-5.)  If, however, the Court considers Plaintiffs' exhibits, the Forest Service explains

below why none of these events are similar to the Derbies and that these exhibits actually

*support* the Forest Service's determination in this case.[14]

- **Exhibits A and B (ECF Nos. 80-4 and 80-5)** address a coyote and fox hunting competition
  in Indiana.  However, Plaintiffs have not submitted the complete record, and it is therefore

---

[14]    If the Court chooses to consider Plaintiffs' extra-record evidence, it should likewise
consider the responsive extra-record evidence offered by the Forest Service through the
Declaration of Kenneth D. Paur ("Paur Decl.").

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 14**

impossible to tell if the event is similar to the event here. For example, it is unknown whether the Indiana competition occurred *only* on National Forest land, or if the promoters expressly invited participants to hunt on National Forest land, or charged a fee for hunting on National Forest land. It is also possible that the Indiana forest erred in its interpretation of the regulations. As discussed below in Section II.C, if one Forest Service field office made a mistake, that does not support Plaintiffs' argument that the Forest Service has been inconsistent in its interpretation of the regulations, or the that the Forest's interpretation here was arbitrary and capricious.

- **Exhibits C and D (ECF Nos. 80-6 and 80-7)** address "shooting competition[s]." For both events the shooting was contained to a concentrated area. In Exhibit C, the permit explains that all shooting will take place in "the pit," and requires the necessary amenities, such as toilets and trash collection. In Exhibit D, the shooting match was contained to five shooting bays. As explained above, the Derbies at issue here did not involve any concentrated use.

- **Exhibit E (ECF No. 80-8)** involves a possible coyote hunt on the Malheur National Forest. The letter does not conclude that a permit is required, but instead directs the group to submit an application. This is the same process followed by the Forest here that ultimately led to a determination that no permit was required. The permit application described the event so that the Forest Service could determine if a permit would be required by the regulations.

- **Exhibit F (ECF No. 80-9)** similarly informs the potential event planner that a special use permit *may be required*. It does not reach a conclusion as to whether such a permit would be required. Furthermore, the Forest Service's Southwestern Region provided additional clarification within a month to further describe when a permit may be required, explaining that "an entry fee for a state-wide event does not mean a special use authorization is required. The event must actually be on [National Forest] lands to be considered an activity, subject to the special use regulations found in 36 CFR 251." (Paur Decl. Ex. 3.)

Simply put, Plaintiffs have offered no evidence (extra-record or otherwise) that the Forest's

determination here was inconsistent with determinations related to similar events.

      **C.**      **Even if Plaintiffs' extra-record documents show any inconsistencies, the Forest Service's interpretation of its own regulations is entitled to deference.**

Plaintiffs argue that the Court should not defer to the Forest Service's interpretation of its

own regulations because that interpretation purportedly conflicts with Plaintiffs' extra-record

exhibits. (Pls' Mem. at 15.) Even if that was true, the Forest Service is still entitled to

deference. *See Exxon Corp. v. Lujan*, 970 F.2d 757 (10th Cir. 1992). In Plaintiffs' extra-record

exhibits, the purportedly inconsistent determinations were made by field or regional offices.

Here, in contrast, the Forest's determination that no permit was required was not only consistent

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 15**

with that of the Chief of the Forest Service and high level officials in the Chief's office (*See* Paur Decl. Exs. 2, 4), but also ratified by the Chief (FSAR000327.)  The Forest Service's determination here was also consistent with that of other field and regional offices.  (*See* Paur Decl. Exs. 1, 3, 5, 6.)  Under these circumstances, deference to the agency's interpretation is appropriate.  *Exxon Corp.,* 970 F.2d at 762. (finding that where the alleged inconsistent decision was made by a regional office of the BLM and the decision at issue had been issued on a national level, the agency was entitled to deference).

## III.   PLAINTIFFS' NEPA CLAIM FAILS BECAUSE THERE WAS NO MAJOR FEDERAL ACTION.

Plaintiffs' NEPA claim fails because they cannot show that the Forest Service's determinations that its regulations did not require permits for the Derbies are "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). In *Alaska v. Andrus*, 591 F.2d 537 (9th Cir. 1979), the Ninth Circuit ruled that a federal agency's decision not to intervene in a wolf-kill program on federal lands "does not call for compliance with NEPA."  *Id.* at 538.  The plaintiff had sued the Secretary of the Interior to get him to stop a state-run wolf hunt.  Setting aside the issue of whether the Secretary could do this, the court found that because "[n]o federal funds [we]re to be spent, nor federal agents employed, in the wolf-kill program[,] . . . [t]he Secretary's nonexercise of any authorities and duties he may possess in the field of wildlife management was, at most, a nonuse of a power of supervision" that did not require an environmental impact statement under NEPA.  *Id.* at 541.

Even where federal officials approve a private or state program or have limited involvement in it, it is not a federal action triggering environmental analysis under NEPA.  *See Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1039 (9th Cir. 1985) (finding no federal action where three of eight members of a pest control board were federal officials); *Defenders of*

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 16**

*Wildlife v. Andrus,* 627 F.2d 1238 (D.C. Cir. 1980) (holding that "federal 'approval' of another party's action does not make such action 'federal action' unless the federal government undertakes some 'overt act' in furtherance of that other party's project"); *contra Fund for Animals v. Mainella*, 283 F. Supp. 2d 418, 431-32 (D. Mass. 2003) (finding federal action where the National Park Service made a "substantial contribution of personnel and equipment" to a hunt and determined where it took place).

In this case, as in *Andrus* and similar hunting cases, the Forest Service did not sponsor, approve of, or participate in the Derbies.  By not requiring a permit before Derby participants may have hunted on federal land pursuant to state regulation, it simply treated the Derby participants like all other hunters of all other wildlife on all other days of the year.  This "nonexercise" of authority (whatever that authority may be) is not a major federal action.[15]

Further, even if the Forest Service determined that a permit was required, a decision to issue a permit for minor, short-term special uses, such as a weekend event – whether a commercial group use, a recreation event, or a noncommercial group use – is categorically excluded from the requirement to prepare an environmental assessment or environmental impact statement under NEPA.  36 C.F.R. § 220.6(d)(8).  Plaintiffs' NEPA claim fails to pass muster.

---

[15]    Plaintiffs' contention that the Forest Service's determination is "controversial," and consequently requires an environmental impact statement, is misleading.  (Pls' Mem. at 19.)  In the NEPA context, "'controversial' is 'a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'"  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation omitted).  That there was significant opposition to the Derbies is not relevant to determining whether it was controversial or whether there was "major federal action."

Plaintiffs' reference to BLM's Decision Record to support their contention that the 2015 Derby was controversial is misplaced.  First, BLM's Decision Record is not included in the Forest Service's administrative record and so should not be considered in this record review case.  Second, BLM's Decision Record sheds no light on the question before this Court because BLM's regulations are different from the Forest Service's.  *Compare* 43 C.F.R. §§ 2932.11(a)(2), 2932.5 *with* 36 C.F.R. §§ 251.50, 251.51.

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 17**

**IV.    THE INJUNCTIVE RELIEF PLAINTIFFS SEEK IS NOT APPROPRIATE.**

    **A.    The APA does not permit review of discretionary agency enforcement action.**

This Court should decline to order injunctive relief because Plaintiffs seek to compel the Forest Service to take discretionary enforcement action – to stop any future derby.  (*See* Pls' Mem. at 20 (asking the Court to "enjoin the Forest Service from *allowing* the killing contest on Forest Service lands unless and until a special use permit has been issued").)  The APA does not permit judicial review of final agency action that "is committed to agency discretion by law." *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 701(a)).  An agency's decision to take or refuse to take an enforcement action is presumed to be "committed to agency discretion by law."  *Heckler v. Chaney*, 470 U.S. 821, 832-833 (1985).

Under 36 C.F.R. § 251.50, *users* are required to obtain special use authorization in certain circumstances.  Section 251.50 does not require the Forest Service to take a mandatory, non-discretionary action.  Indeed, the regulations provide no mechanism for the Forest Service to force a party to obtain a permit in advance.  *See* 36 C.F.R. § 261.10(k).  Instead, the regulations place the burden on the user to seek special use authorization when appropriate.  *Id.*  The Forest Service then processes the application or decides whether and what action to take if regulations are violated.  *Id.*  The regulations thus mandate no discrete action by the Forest Service

    Judicial review of discretionary enforcement action is unsuitable for many reasons:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise.  Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all . . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities. *Id.* 831-32.

Plaintiffs' requested relief highlights the concerns identified in *Heckler*.  If the Court orders that

the Forest Service "shall not allow" a future derby to go forward, that would require extraordinary affirmative action by the Forest Service to somehow prohibit derby-related hunting.  As in *Heckler*, the Court should decline to order the Forest Service to take discretionary enforcement action.

      **B.**      **A permit may not be required if the Forest Service determines that a future derby is adequately regulated by a state agency.**

Any injunction prohibiting the Forest Service from allowing a future derby to go forward "unless and until a special use permit has been issued" also would be premature.  A derby may be exempted from any permitting requirement under 36 C.F.R. § 251.50(e).  (FSAR000190.) Special use authorization is not required if the authorized officer Forest Service officer determines that "the proposed use is regulated by a State agency . . . in a manner that is adequate to protect National Forest System lands and resources."  36 C.F.R. § 251.50(e).  Here, all wolf and coyote hunting is regulated by Idaho, consistent with federal statutes adopting the longstanding practice of deferring to state regulation of hunting on federal lands.  *See* 16 U.S.C. § 528; 16 U.S.C. § 1604(e)(1) (National Forest Management Act of 1976) (incorporating same); 36 C.F.R. § 241, Subpart A.  It is therefore reasonable – if not necessary – for the Forest Service to defer to the State of Idaho's hunting regulations, and Plaintiffs have not alleged that a future derby would be inconsistent with those rules, with any federal program, or with the Forest Plan. *See* Forest Service Handbook § 2610.3 (recognizing the "role of States to manage wildlife and fish populations within their jurisdictions"); *id.* at § 2643.1 (stating that as long as they are not in conflict with federal law, "State Fish & Wildlife laws and regulations apply on National Forest System lands").  Thus, derby organizers may be exempted from obtaining a permit, if the Forest Service officer determines that a future derby is adequately regulated by the State.

**C.    Injunctive relief is not in the public interest.**

Injunctive relief is only appropriate where a party demonstrates, among other things, that "it has suffered an irreparable injury" and "that the public interest would not be disserved by a permanent injunction." *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) (citations omitted).  Here, Plaintiffs cannot prove irreparable injury (*see supra* Section I.B). They also cannot show that the public interest would not be harmed by a permanent injunction.

Leaving the regulation of hunting to the State of Idaho serves the public interest.  The court's observations in *Idaho Sporting Congress, Inc. v. Jemmet*, No. 95–CV-51–LMB, 1997 WL 855507 (D. Idaho July 8, 1997), are instructive.  There, the plaintiff was trying to stop a logging project from moving forward, and the Court noted that that setting the proper level of logging "is a policy decision which is in sharp dispute among the other political branches in the state of Idaho and in the United States." *Id.*  This certainly applies to wolf and coyote hunting. Plaintiffs' APA and NEPA claims aimed at Forest Service inaction do not provide a stable platform for "second-guess[ing] or alter[ing] the underlying policy decision" about canine hunting in the Idaho.  *Id.*  The public interest will be served best by allowing the political process to run its course or, alternatively, by addressing hunting through a lawsuit that actually challenges hunting.[16]

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied and the Forest Service's cross-motion should be granted because judicial intervention is not appropriate here and, even if it was, the Forest Service's interpretation of its regulation was not arbitrary and capricious.

---

[16]    Plaintiffs' election to sue the Forest Service, rather than the State, is particularly perplexing, given Plaintiffs' argument that Idaho Fish and Game does not support hunting contests.  (*See* Pls' Mem. at 8 n.4.)

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 20**

Respectfully submitted this 26th day of July, 2016.

WENDY J. OLSON
UNITED STATES ATTORNEY
By


/s/ Christine G. England
CHRISTINE G. ENGLAND
Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 26, 2016, the foregoing **THE FOREST SERVICE'S**

**MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

was electronically filed with the Clerk of the Court using the CM/ECF system and a copy was

served via electronic mail to the following person(s):

Natalie J Havlina
Law Office of Natalie J. Havlina
P.O. Box 1675
Boise, ID  83701
havlinalaw@gmail.com

Laura King
Western Environmental Law Center
103 Reeder's Alley
Helena, MT  59601
king@westernlaw.org

John R. Mellgren
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR  97401
mellgren@westernlaw.org

Andrea Lynn Santarsiere
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
asantarsiere@biologicaldiversity.org

/s/ Kathy Sims
Kathy Sims, Paralegal

**THE FOREST SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 22**