UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, CASCADIA WILDLANDS, KOOTENAI ENVIRONMENTAL ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT, PROJECT COYOTE,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE, CHARLES A. MARK, in his official capacity,<br><br>    Defendants. | Case No.: 4:14-cv-00488-REB<br><br><br>**MEMORANDUM DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, AND MOTION TO STRIKE** |

    Currently pending are cross-motions for summary judgment filed by Plaintiffs Wildearth Guardians, *et al.* ("Plaintiffs") and the United States Forest Service ("the Forest Service") (Dkt. 80, 83), and a motion to strike filed by the Forest Service (Dkt. 85). The Court heard oral argument on the motions, and having carefully considered the record and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order.

### PROCEDURAL BACKGROUND

    This case involves Plaintiffs' contentions that the Forest Service was required by law to examine and potentially constrain a "predator derby" - that is, a private competition involving the hunting of coyotes, wolves, and other wildlife[1] ("the Derby") -  to take place on public lands

---

[1] Hunting is subject to state regulation. *See* 16 U.S.C. § 528, § 1604(e)(1). Wolves are not a listed endangered species in Idaho, as they were removed from Endangered Species Act

**MEMORANDUM DECISION AND ORDER- 1**

in the Salmon-Challis National Forest ("the Forest") and other public or private lands near Salmon, Idaho. Plaintiffs claim that the Forest Service violated its own regulations, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA") by failing to require a special use permit for this event. The event was first held on December 28-29, 2013 and challenged in a separate lawsuit, *Wildearth Guardians v. Mark*, Case No. 4:13-cv-00533-CWD. In that case, before Magistrate Judge Candy W. Dale, Plaintiffs' request for a temporary restraining order to stop the Derby was denied. Plaintiffs voluntarily dismissed the case on January 16, 2014. *See* Case No. 4:13-cv-00533-CWD, Dkt. 23 (*also at* 2013 WL 6842771 (D. Idaho Dec. 27, 2013)), Dkt. 25.

Plaintiffs filed this case on November 13, 2014, seeking to enjoin a second Derby proposed by the same private organization, Idaho for Wildlife, to take place on January 2nd through 4th of 2015. Complaint (Dkt. 1) ¶ 41. In Plaintiffs' Second Amended Complaint, they allege that: (1) the Forest Service violated NEPA because the Forest Service's decision that a special use permit is not required was arbitrary and capricious and made without observance of procedure; and (2) the Forest Service violated NEPA by failing to take a "hard look" at impacts on the environment. Second Amended Complaint ("SAC") (Dkt. 23) ¶¶ 108-123. Plaintiffs request that the Court: (1) declare that the Forest Service violated NEPA in failing to evaluate the Derby's impacts on the environment on the Forest; (2) order the Forest Service to comply with its own regulations and guidance regarding special use permits as they apply to the Derby;

---

protections in Idaho on May 5, 2011. Thomas Keegan Decl. ¶ 8 (FSAR000129). The Idaho State Legislature enacted a wolf management plan to support the de-listing of wolves. Licensed hunting and trapping by private individuals or group is the primary way the State regulates wolf populations. *Id*. at ¶ 10 (FSAR000129). The Idaho Department of Fish Game has established "wolf management zones" and sets harvest limits for these zones. *Id*. at ¶ 16 (FSAR000130).

**MEMORANDUM DECISION AND ORDER- 2**

and (3) enjoin the Forest Service from allowing the Derby on the Forest until a special use permit has been issued and environmental review pursuant to NEPA has been completed. *Id*. at p. 32.[2]

## FACTUAL BACKGROUND

The relevant Forest Service regulations were promulgated by the Department of Agriculture pursuant to 16 U.S.C. § 551, which authorizes the Secretary of Agriculture to protect the public forests against destruction by fire and depredation and to make rules and regulations as will preserve the National Forests from destruction by regulating occupancy and use. Subpart B of the regulations governs "special uses" of Forest Service lands. 36 C.F.R. § 251.50(a). Most users engaging in "noncommercial recreational activities" on the Forest, *e.g.*, hikers, campers, hunters, and boaters, do not need a special use permit. *Id*. at § 251.50(c). Special use permits are required, however, under section 251.50(c) for certain uses, including, commercial uses (any use where an entry or participation fee is charged or the primary purpose is a sale of good or service), recreation events (recreational activities for which an entry or participation fee is charged), and noncommercial group uses (defined as a group of 75 or more people, either participants or spectators). *Id*. at §§ 251.50, 251.51.

Idaho for Wildlife scheduled its first "Coyote and Wolf Derby" in December of 2013. Participants were to sign in and attend a rules meeting in Salmon, Idaho on the first evening of the event, followed by a weekend of hunting animals such as wolves, coyotes, skunks, weasels,

---

[2] The Bureau of Land Management was initially a defendant in this case but the parties reached an agreement to settle those claims out of court. *See* Dkt. 103, 107. Accordingly, this decision pertains only to the claims and facts relating to the Forest Service.

**MEMORANDUM DECISION AND ORDER- 3**

jackrabbits, raccoons, and starlings on private land or federal or state land (including the Forest). At the end of the contest period, participants were invited to attend a gathering in Salmon, where prizes were awarded. The Forest Service concluded that there were no activities associated with the 2013 Derby that required a special use permit. Plaintiffs sought a temporary restraining order to halt the Derby, but that request was denied by Judge Dale in the case previously referenced. *See Wildearth Guardians v. Mark*, 4:13-cv-00533-CWD, 2013 WL 6842771 (D. Idaho Dec. 27, 2013). The Derby went forward on December 28-29, 2013, with approximately 26 hunters participating and no wolves were killed. Steve Alder Decl. (Dkt. 83-3) ¶ 3.

On August 7, 2014, Idaho for Wildlife submitted an application to the Forest Service for a Special Use Permit for a Derby to be held on the Forest and other lands near Salmon, Idaho on January 2-4, 2015. FSAR000198-199. On August 19, 2014, Charles Mark, Forest Supervisor for the Salmon-Challis National Forest, sent a letter to Idaho for Wildlife informing the group that "a permit will not be issued, nor is one needed for this event." *Id*. Specifically, Mr. Mark found that participants were not "paying organizers to go onto the National Forest to hunt, and organizers are not offering equipment or services to facilitate hunting on the National Forest. Participants . . . may hunt anywhere they wish, they are not limited to an area on NFS land, nor are they being specifically invited to . . . NFS land." *Id*. Additionally, Mr. Mark noted that the Derby event "is confined to a business location in the Town of Salmon, and involves the award of prizes to hunters who bring animals taken during noncommercial hunting activities to that business location to compete for prizes." *Id*.

Following this decision, several conservation organizations wrote to the Forest Service

**MEMORANDUM DECISION AND ORDER- 4**

asking it to take a "fresh look" at the Derby due to modifications Idaho for Wildlife had made to its proposal. *See* FSAR000018-21. However, the Chief of the Forest Service, Thomas Tidwell, agreed with Charles Mark's decision, stating that "no special use permit is required for the activities currently proposed by Derby organizers." FSAR000327. Chief Tidwell also explained why he believed the event was not a "group use":

> The development of a permit requirement for group uses was based on the need to manage large, concentrated groups of people to prevent unacceptable environmental impacts, by assuring appropriate public health and sanitation measures are followed. There are often 75 or more people on National Forests at the same time who are participating in shared or similar activities, but that does not, in and of itself, make them a 'group' for purposes of the regulation.

FSAR000327-328.

## STANDARD OF REVIEW

**1.      Statutory Framework**

The National Environmental Policy Act ("NEPA") was enacted to ensure that the federal government makes major decisions significantly affecting the environment only after considering the impacts of those decisions and exploring possible alternatives. 42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1. NEPA establishes procedures to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed action in advance of a final decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

The APA provides the authority for judicial review of agency decisions under NEPA. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). Under the APA, a court

**MEMORANDUM DECISION AND ORDER- 5**

must uphold an agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007). Generally, "[a]n agency decision will be upheld as long as there is a rational connection between the facts found and the conclusions made." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011). The court will deem an agency action to be arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The court may not overturn a decision simply because it disagrees with the decision or with the agency's conclusions about environmental impacts. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citations omitted). The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *Id.* (citation and marks omitted).

### 2.     Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes

**MEMORANDUM DECISION AND ORDER- 6**

over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For summary judgment purposes, an issue must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat. Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)); *see also British Motor. Car Distrb.v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citation omitted).

When parties submit cross-motions for summary judgment, the Court must independently search the record for factual disputes. *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment "where both parties essentially assert that there are no material factual disputes" does not vitiate the Court's responsibility to determine whether disputes as to material facts are present. *See id.*

In considering a motion for summary judgment, the Court does not make findings of fact or determine the credibility of witnesses, *Anderson*, 477 U.S. at 255; rather, it must draw all inferences and view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986); *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

**MEMORANDUM DECISION AND ORDER- 7**

ANALYSIS

1.      **Plaintiffs Have Standing**

Article III of the United States Constitution limits judicial power to deciding cases and controversies. The standing doctrine requires a plaintiff to allege a "personal stake in the outcome of the controversy . . . to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 442 U.S. 490, 490-99 (1975). A plaintiff must establish that:

> he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural and hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). It is Plaintiffs' burden to demonstrate their standing. *Id.* at 493.

The concrete harm requirement can be satisfied by an injury to the "recreational or even the mere esthetic interests of the plaintiff." *Summers*, 555 U.S. at 493. The Ninth Circuit has recognized that such an injury can be found in the testimony of a member of the environmental group that he or she "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010). Further, "[w]here the recreational use of a particular area has been extensive and in close proximity to the plaintiff, an affiant's expressed intention to continue using the land is sufficiently concrete to underwrite an injury-in-fact." *Jayne*, 706 F.3d at 999 (citation and internal quotation marks omitted). However, a "vague desire to return to the

**MEMORANDUM DECISION AND ORDER- 8**

area 'without any description of concrete plans, or indeed any specification of when the some day will be' does not support a finding of actual or imminent injury." *Id*.

Plaintiffs submit affidavits of several of their members. For example, Ms. Wagenknecht splits her time between Salmon and Leadore, and she regularly recreates on the Salmon-Challis National Forest in her personal time and through her volunteer work with the Salmon Animal Shelter. Louise Wagenknecht Decl. (Dkt. 80-10); Wagenknecht Second Decl. (Dkt. 88-2). Ms. Wagenknecht visits the Forest dozens of times a year and year-round for dog-walking, hiking, wildlife-watching, and many other activities and intends to continue to do so in the future. *Id*. Ms. Wagenknecht stated that she has concern the Derbies will harm her interests in viewing wolves and coyotes on the Forest. *Id*. Further, she also has concerns and fears about recreating on the Forest during the Derbies because she fears she and her dogs would not be safe as there may be less careful hunting practices due to time pressure and cash prizes. *Id*. *See also* Margaret Clay Decl. (Dkt. 80-9); Kenneth Cole Decl. (Dkt. 80-11); Julie Dalsaso Decl. (Dkt. 80-12); Josh Laughlin Decl. (Dkt. 80-13); George Wuerthner Decl. (Dkt. 80-14).

In addition to injury in fact, the Forest Service also challenges the redressability of Plaintiffs' injuries. The Forest Services contends that because the 2013 and 2015 Derbies have already taken place, and no subsequent Derbies have taken place or are scheduled, the Court cannot redress Plaintiffs' injuries. The Forest Service also argues that because hunting will occur regardless of the Derby, enjoining future Derbies or requiring a special use permit will not redress Plaintiffs' concerns regarding wolf and coyote populations. *See, e.g., Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010) (past injury by itself does not establish standing).

**MEMORANDUM DECISION AND ORDER- 9**

The Court is persuaded, and for purposes of this litigation will assume, that Plaintiffs have standing to bring their claims. "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational value of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000). There is some tenuousness to Plaintiffs' arguments regarding redressability and injury given that no specific plans for future Derbies have been announced, no wolves were killed in either the 2013 or 2015 Derbies, and the State of Idaho continues to allow hunting on the Forest and other lands. Nonetheless, there is a sufficient basis for standing as presented in the current record and the Court will address the merits of Plaintiffs' claims.

2. **The Forest Service's Decision on the Special Use Permit was Not Arbitrary and Capricious**

   A. **Special Use On Forest Service Land**

The Forest Service, through Mr. Mark, concluded that no permit was required for the Derbies because even though there was a "use of National Forest land," participants were not paying to go onto the Forest to hunt, they could hunt anywhere they wished, and the event of the Derby, where participants gathered and the competition unfolded for the awarding of prizes, took place in the city of Salmon, not on the Forest.

The Forest Service's interpretation of its own regulation is entitled to substantial deference. Mr. Mark's rationale rested on the fact that although some part of the proposed hunting activity might occur on the Forest, it would not necessarily occur there, and none of the

**MEMORANDUM DECISION AND ORDER- 10**

other events was to take place on the Forest. Some might disagree with that conclusion, as Plaintiffs do here, but the Forest Service's conclusion had a reasonable basis as its underpinning.

### B. Group Use

A group use is an activity "conducted on National Forest Service lands that involves a group of 75 or more people." 36 C.F.R. § 251.51. Similar to the discussion above, the "activity," specifically the awarding of prizes and any payment of fees (or making of donations), did not take place on the Forest. The hunting of animals *could* occur on the Forest, but did not necessarily as participants could hunt on private and state land as well.

Additionally, the group use rule (as its name describes and as Chief Tidwell explained in his decision[3]) pertains to the *congregation* of large numbers of people in the forest. *See United States v. Masel*, 54 F. Supp. 2d 904, 913 (W.D. Wis. 1999) (regulation is directed at the congregation of large numbers of people in forest); *see also Black v. Arthur*, 18 F. Supp. 2d 1127, 1132 (D. Or. 1998), ("'group' refers to some collection of individual people"), *aff'd on other grounds*, 201 F.3d 1120 (9th Cir. 2000). The rule was adopted to manage environmental impacts associated with a large number of individuals, in a *concentrated* area. *See* 60 Fed. Reg. 45258-01 at 45259, 45262, 45264 (Aug. 30, 1995). By its very nature, the Derby would involve hunters dispersed around the geographic footprint of the Derby. The participants could hunt where and when they desired during the two to three days allotted for the Derby. Nothing in the

---

[3] "The development of a permit requirement for group uses was based on the need to manage large, concentrated groups of people to prevent unacceptable environmental impacts, by assuring appropriate public health and sanitation measures are followed. There are often 75 or more people on National Forests at the same time who are participating in shared or similar activities, but that does not, in and of itself, make them a 'group' for purposes of the regulation." ARFS000327-328.

**MEMORANDUM DECISION AND ORDER- 11**

record indicates there would be a concentration or congregation, in the sense of what constitutes a "group," of 75 or more hunters on the Forest.  (Further, there is no sense to the idea that the predators would be congregated any more than the hunters seeking them out would be congregated.)  To the contrary, the nature of the use of the National Forest lands during the days of the Derby would be much the same, or even much less in impact, than the peak periods of hunting season, such as the opening weeks of bow season and rifle season for deer and elk when there are thousands of hunters afield.[4]  *E.g.*,  Mark Decl. ¶¶ 9-13 (ARFS00125-000126); Keegan Decl. ¶ 18 (FSAR000131).   Even during those peak times, there are few reports of conflicts between hunters and non-hunters.  *Id*.

Hence, the Forest Service's decision that the Derby was not a "noncommercial group" has considered appropriate factors, and is supported by an appropriate and plausible explanation.

   C.   **Commercial Use**

The definition of commercial use or activity is also tied to whether the activity is *on* Forest lands:

> any use or activity *on* National Forest System lands (a) where an entry or participation fee is charged, or (b) where the primary purpose is the sale of a good or service, and in either case, regardless of whether the use or activity is intended for a profit.

36 C.F.R. § 251.51 (emphasis added).

Idaho for Wildlife initially proposed charging an entry fee, but decided instead to accept donations if the participants were so inclined.  The Court is mindful that sometimes such a

---

[4] The Salmon-Challis National Forest is comprised of more than 4.3 million acres.  Idaho for Wildlife predicted, at most, 200 hunters. The 2013 Derby had approximately 26 hunters and the 2015 Derby had approximately 86 hunters.

**MEMORANDUM DECISION AND ORDER- 12**

distinction is artificial, but there is nothing in the record to establish that people could not participate *unless* they made a donation.  Further, the Derby was focused on the competition in town at which participants could choose, but were not required, to present animals they had taken in their hunting and compete for prizes.

  Further, Idaho for Wildlife could not have conditioned the right of the participants to hunt on the Forest land upon the payment, or donation, of a fee. A similar case in the Tenth Circuit involved the application of a similar regulation (36 C.F.R. § 261.10(c)) to the delivery of snowmobiles by a snowmobile retailer to customers *on* Forest Service land.  The defendant argued that he was paid on private land, and therefore not conducting a commercial activity on Forest land. The court disagreed, holding that one could not bypass permit requirements by conducting part of the activity, *i.e.*, receiving payment, off Forest Service lands.  *United States v. Brown*, 200 F.3d 710, 713-14 (10th Cir. 1999).  In this case, however, the Derby awards prizes for the results of hunts undertaken by participants which may have occurred at any of a number of locations, not limited to Forest land, and which did not require payment to, the permission of, or the assistance of Idaho for Wildlife to be able to use Forest land.[5]  Thus, these facts starkly contrast to the facts of *Brown*, where the defendant's commercial transaction required the use of the National Forest land and the customers of his business could only accomplish their particular use of the Forest land when he delivered snowmobiles to them inside the Forest boundaries.

  Idaho for Wildlife did not charge a fee for either the 2013 or 2015 Derby.  The "primary purpose" of the Derby was not the sale of a good or service.  The Derby did involve hunting, and

---

  [5] The Court is not persuaded by Plaintiffs' argument that the primary purpose of the Derby was the sale of furs from animals killed during the contest.

**MEMORANDUM DECISION AND ORDER- 13**

possibly hunting on the Forest, but that hunting was a legal activity each of the participants could pursue on Forest land if they chose to do so, independent of and unrelated to the Derby. Accordingly, the Forest Service's decision that the Derby did not involve a commercial use has considered appropriate factors, and is supported by an appropriate and plausible explanation.

### D.     The Derby was Not a Recreation Event

For the same reasons discussed above, the Derby does not fall within the definition of a "recreation event," as Plaintiffs contend in an attempt to invoke Section 251.50(d)(1).[6]  A recreation event is a "recreational activity conducted on National Forest System lands for which an entry or participation fee is charged, such as animal, vehicle, or boat races, dog trials, fishing contests, rodeos, adventure games, and fairs." 36 C.F.R. § 251.51.  Without an entry or participation fee, there is no basis for applying this section of the regulation and requiring a special use permit.  Further, the Forest Service also emphasized more generally that if there was any event involving a gathering of people that was a part of the Derby, that event was to be held in Salmon, not on the Forest.  To the extent that any use of forest roads was to occur, under the Forest Service's interpretation of its own regulations,  it would be for hunting activity, which was available to the participants independent of the Derby.  Such a view of its own regulations might be subject to disagreement, but the Forest Service's interpretation of its regulations on this perspective is also entitled to deference and is not arbitrary, capricious, or an abuse of discretion.

---

[6] "Travel on any National Forest System road shall comply with all Federal and State laws governing the road to be used and does not require a special use authorization, unless: The travel is for the purpose of engaging in a noncommercial group use, outfitting or guiding, a recreation event..."  36 C.F.R. § 251.50(d)(1).

**MEMORANDUM DECISION AND ORDER- 14**

3.  **The Forest Service's Decision that a Special Use Permit was Not Required Did Not Trigger NEPA**

"NEPA was passed by Congress to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). In addition, NEPA is a procedural statute and does not mandate any particular substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

NEPA requires preparation of an environmental impact statement ("EIS") only for "major Federal actions significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C). The federal regulations define "major Federal action" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. "Actions" include: failure to act by responsible official where that failure is subject to review; new and continuing activities; new or revised agency rules, regulations, plans, policies, or procedures; or approval of specific projects including actions approved by permit or other regulatory decision. *Id*.

It is true that "if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action . . ." *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir.1996) (citations omitted). Likewise, federal inaction can trigger NEPA's EIS requirement. *Id*. at 445. Every denial of a request to act, however, is not considered a "major federal action." *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014); *State of Alaska v. Andrus*, 591 F .2d 537, 540 (9th Cir. 1979) (explaining that "even

**MEMORANDUM DECISION AND ORDER- 15**

if the Secretary had some power under a delegation by Congress to stop the wolf-kill program . . . his inaction was not the type of conduct that requires an environmental impact statement."); *Maughan v. Vilsack*, 2014 WL 201702 (D. Idaho Jan. 17, 2014); *Fund for Animals v. Thomas*, 932 F. Supp. 368, 371 (D.D.C.1996) (holding that Forest Service policy of deferring to states on game-baiting was not a major federal action).

      Here, the Forest Service implicitly concluded that the Derby, and an agency decision upon whether the activities of the Derby required the Forest Service to regulate or constrain the actions of anyone participating or sponsoring the Derby, did not rise to the level of a major Federal action significantly affecting the quality of the human environment. On this record, the Court is similarly persuaded that there was nothing in the Forest Service's consideration and action (or inaction) upon the fact of the Derby and its actual or anticipated impact upon the Forest lands that would constitute a "major Federal action" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. In reaching that conclusion, the Court has considered that the Derby involved:

      (1) the potential use of some portion of the vast expanse of the lands of the Salmon-Challis National Forest;

      (2) by persons scattered across those lands in the conduct of an activity – hunting – which otherwise occurs on an ongoing basis in the Forest, consistent with Idaho's regulation of hunting activities;

      (3) whose use of the Forest, even if they participated in a contest with other individuals about the results of their hunting activities, did not require payment of an entry fee or the use of commercial services to be able to use the Forest Service lands; and,

**MEMORANDUM DECISION AND ORDER- 16**

(4) whose use of the Forest roads, if they were to use the Forest roads, was not to participate in a recreation event which called for an entry or participation fee.

On this record, the Court is not persuaded that the nature of any activities that might occur on the Forest in connection with the Derby is qualitatively or quantitatively different from the activities of hunters in any other year on the same Forest lands, in any way that might implicate NEPA.  Neither the underlying details of, nor the Forest Service's decision not to require a special permit, constituted a major Federal action significantly affecting the quality of the environment.  Even assuming that Derby participants used the Forest lands, the nature of their activities in hunting for predators upon the Forest lands is a permissible and common use of a multiple use public resource, already subject to other constraints that the Forest Service employs through its regulations to protect that resource and subject to regulation of that activity by the state of Idaho.  The Court does not doubt the genuineness of the Plaintiffs' declarants who testify that the nature of their own experience of the Forest is altered or diminished by the fact of a Derby that features such hunting activities or the potential result of the such hunting activities in reducing the numbers of certain wildlife.  But such use is permitted under the Idaho's regulation of hunting, including for predators, and is a use that has existed on the Forest since the days that Theodore Roosevelt first set aside the forest reserve in 1906 that later became the Forest.

Hence, the Court is not persuaded that the provisions of the National Environmental Policy Act are implicated by the Forest Service actions at issue in this lawsuit.

## MOTION TO STRIKE

The Forest Service moves to strike six exhibits Plaintiffs have included with their motion

**MEMORANDUM DECISION AND ORDER- 17**

for summary judgment. (Dkt. 85) These include determinations and special use permits from other Forests regarding hunting, or shooting, competitions. *See, e.g.*, Exhibits A, B (Dkt. 80-3, 80-4) (Special Use Permit for coyote and fox hunting competition in Hoosier National Forest), Exhibit C (Dkt. 80-5) (Special Use Permit for "club campout and shooting competition" at Perry Pit in Coconino National Forest), Exhibit D (Dkt. 80-6) (special use permit for "Cowboy Action Shooting Match" to occur on National Forest Service lands), Exhibit E (Dkt. 80-7) (letter from Malheur National Forest concerning a JMK Coyote Hunt), Exhibit F (Dkt. 80-8) (letter from Southwestern Region of the Forest Service regarding statewide competition coyote hunt in New Mexico).

Judicial review of an agency decision focuses on the administrative record in existence at the time of the decision. *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). There are a limited number of exceptions for the allowance of materials not contained in the administrative record: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record it is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (*quoting Southwest Ctr.*, 100 F.3d at 1450). The Court will apply these rules of APA review in addressing the motion.

The six exhibits that the Forest Services seeks to strike were not before the Salmon-Challis National Forest at the time it made its decision. Plaintiffs argue that these exhibits show how the Forest Service had inconsistently interpreted and applied its own regulations regarding

**MEMORANDUM DECISION AND ORDER- 18**

Special Use Permits. Plaintiffs seek to have these documents added to the record through judicial notice. *See* Fed. R. Evid. 201. However, even if these documents may be subject to judicial notice, that does mean any one or more fall within one of the enumerated exceptions of APA review. The Court concludes that none of the exceptions to the APA's review rules applies here. Therefore, such exhibits are not properly part of the record for this Court's review, and the Court will grant the Forest Service's motion to strike these exhibits.

The Forest Service also seeks to strike several statements found in the declarations submitted in support of Plaintiffs' standing argument. *See* Motion to Strike, App'x A (Dkt. 85-2). The Forest Service contends that several statements found in these declarations are inadmissible under the Federal Rules of Evidence for various reasons (foundation, improper expert opinion). The Court does not find it necessary to strike these statements. Such declarations were considered for standing purposes, and to the extent that some statements in the declarations carried less persuasive value because of potential evidentiary infirmities, the Court has been able to consider such potential flaws and give such statements less weight.

Accordingly, the Forest Service's motion to strike will be granted in part and denied in part.

The Forest Service likewise submitted several "extra-record" documents. *See* Exhibits 1-6 attached to the Declaration of Kenneth Paur (Dkts. 83-5 – 83-10). Plaintiffs contend that if the Forest Service's motion to strike is granted, these documents should likewise be stricken. *See* Pls.' Reply (Dkt. 88) p. 13, n.8. The Court agrees and orders that these extra-record documents filed by the Forest Service are also stricken.

**MEMORANDUM DECISION AND ORDER- 19**

## ORDER

**IT IS THEREFORE ORDERED** that:

1)    Plaintiffs' Motion for Partial Summary Judgment on the Forest Service Claims (Dkt. 80) is DENIED;

2)    The Forest Service's Motion for Summary Judgment (Dkt. 83) is GRANTED; and

3)    The Forest Service's Motion to Strike (Dkt. 85) is GRANTED IN PART and DENIED IN PART. The Court will strike Exhibits A-F (Dkt. 80-3, 80-4, 80-5, 80-6, 80-7, 80-8);

4)    The Court will also strike Exhibits 1-6 attached to the Declaration of Kenneth Paur (Dkt. 83-5, 83-6, 83-7, 83-8, 83-9, 83-10).

DATED: **March 31, 2017**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER- 20**